No. 63,061

MARY BARTEE, as Mother and Natural Guardian of JENNIFER BAR-
TEE, a Minor; MARK MOHAN, as Father and Natural Guardian of
JANINE M. MOHAN, a Minor; and RICHARD L. MORANZ, *Plain-
tiffs-Appellees*, v. R.T.C. TRANSPORTATION, INC., KEITH
PACHIANO, and CARRIER INSURANCE COMPANY, *Defendants-
Appellees*, v. KANSAS FIRE & CASUALTY COMPANY, *In-
tervenor-Appellant*.

(781 P.2d 1084)

Opinion filed
October 27, 1989.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, of Topeka, argued the
cause, and *Larry G. Pepperdine*, of the same firm, was with him on the briefs for
intervenor-appellant.

*Jerry R. Palmer*, of Palmer, Marquardt & Snyder, of Topeka, argued the cause
and was on the brief for plaintiffs-appellees.

*Stephen W. Cavanaugh*, of Fisher, Heck & Cavanaugh, P.A., of Topeka, argued
the cause and was on the brief for defendants-appellees.

*Pamela Scott*, special assistant attorney general, and *Timothy G. Elliott*, of
Kansas Insurance Department, of Topeka, were on the brief *amicus curiae* for
Fletcher Bell, Commissioner of Insurance.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Kansas Fire & Casualty Company (Kansas Fire
& Casualty), as intervenor, appeals the decision of the district
court awarding damages in three consolidated cases to plaintiffs
claiming uninsured motorist benefits. Kansas Fire & Casualty
denied coverage, but the district court found coverage as a matter

of law. The court tried fault and damage issues and entered judgment in favor of plaintiffs against Kansas Fire & Casualty. The case was transferred to this court from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Most of the facts involved in this case are undisputed. The claims arose from a vehicular accident occurring on the Kansas Turnpike east of Topeka on July 16, 1984. Jennifer Bartee, Janine Mohan, and Richard Moranz occupied a vehicle insured by intervenor Kansas Fire & Casualty. The vehicle policy had a limit of $300,000. The vehicle was owned by the parents of Janine Mohan, who was driving at the time of the accident. Defendant Keith Pachiano was driving a semitrailer rig when it crossed the turnpike median at a construction site, causing the accident. While the tractor was owned by Pachiano, the semitrailer rig was owned by defendant R.T.C. Transportation, Inc., (R.T.C.) a Georgia corporation. The tractor and semitrailer were insured by defendant Carrier Insurance Company (Carrier). Other named defendants were Kansas Turnpike Authority and Reece Construction Company, Inc., (Reece Construction) based upon allegations of improper maintenance and design of a temporary roadway constructed as part of the project.

After the actions were initiated, Carrier, R.T.C.'s insurer, became insolvent. The Georgia Insurers Insolvency Pool assumed defense of the case as statutory successor-in-interest to Carrier. All three plaintiffs then made demand on Kansas Fire & Casualty for uninsured motorist benefits. Plaintiffs Bartee and Moranz also sought uninsured motorist benefits from State Farm Mutual Automobile Insurance Company (State Farm) and Farmers Casualty Company Mutual, (Farmers Casualty) respectively, the companies that provided coverage for their families. Kansas Fire & Casualty filed a motion to intervene, which was granted, seeking declaratory relief in construing the existence, amounts, and priority of coverages under the statutory provisions governing the Georgia Insurers Insolvency Pool and the policies of insurance under which recovery was sought.

Motions for summary judgment were filed by Kansas Fire & Casualty, State Farm, and Farmers Casualty. The trial court was asked to find defendant R.T.C. was an insured motorist within the meaning of the policies and the Kansas uninsured motorist statutes due to the availability of the Georgia Insurers Insol-

vency Pool. Alternatively, Kansas Fire & Casualty asked the trial court to determine the priority of coverages available under the policies issued by itself, Farmers Casualty, and State Farm. Kansas Fire & Casualty also asked the court to find that no coverage of any kind was available to plaintiffs under a personal liability umbrella policy issued by Kansas Fire & Casualty to the Mohan family.

On February 10, 1987, the district court decided all issues adversely to the arguments of Kansas Fire & Casualty. The court held that any liability of the Georgia Insurers Insolvency Pool was contingent upon exhaustion of all benefits available under any uninsured motorist coverage. Based upon the provisions of the individual policies of insurance, the court found defendants State Farm and Farmers Casualty responsible only for excess liability, but then went on to conclude that the statutory prohibition against stacking of uninsured motorist coverages in K.S.A. 1988 Supp. 40-284(d) completely exonerated State Farm and Farmers Casualty. Those companies were dismissed as parties. The court construed the Kansas Fire & Casualty personal liability umbrella policy to include mandatory uninsured motorist coverage of $1 million as excess coverage beyond the $300,000 coverage available under the Mohan auto policy. While the court concluded 40-284(d) prohibited stacking of uninsured motorist coverages, it held that the Mohan personal liability umbrella policy could be treated as an excess policy which combined with the Mohan auto policy for a total limit of $1,300,000.

Thereafter, the parties conducted discovery on the issues of fault and damages. All three plaintiffs entered into settlement agreements with defendants Kansas Turnpike Authority and Reece Construction. Kansas Fire & Casualty did not consent to the settlements. Kansas Fire & Casualty filed motions for summary judgment, arguing that its policies prohibited unauthorized settlements and, therefore, coverage here was void. The motions were denied.

The three cases were consolidated for trial and the issues of fault and damages were tried to the court on October 6, 1988. The fault of Kansas Turnpike Authority and Reece Construction was also compared. The damages found on behalf of the plaintiffs were reduced by the fault attributable to Kansas Turnpike Authority and Reece Construction in the amount of 5% and 10%,

respectively. Judgments were entered on October 7, 1988, against the defendants in the amount of $317,333 for plaintiff Bartee, $90,000 for plaintiff Mohan, and $85,000 for plaintiff Moranz. The trial court denied Kansas Fire & Casualty's cross-claims against Pachiano and R.T.C. as moot. The court stated, however:

"The subrogation rights of Kansas Fire and Casualty Company are merged, as a matter of law, into the judgments entered in favor of the various plaintiffs. To the extent that Kansas Fire and Casualty Company pays uninsured motorist benefits to any plaintiff, it shall be entitled to reimbursement from any judgment proceeds collected from defendants and Pachiano and R.T.C. Transportation, Inc."

Intervenor raises three issues in this appeal:

1. Whether defendants Pachiano and R.T.C. are uninsured motorists. If so, (a) are plaintiffs required to exhaust their own personal uninsured motorist coverage before they are entitled to benefits from the Georgia Insurers Insolvency Pool, and (b) does intervenor have a subrogation right against defendants for the amount paid in uninsured motorist coverage?

2. Does the personal liability umbrella policy that the Mohan family had with intervenor contain uninsured motorist coverage pursuant to K.S.A. 1988 Supp. 40-284?

3. Did the plaintiffs lose their uninsured motorist coverage by settling their claims with Kansas Turnpike Authority and Reece Construction?

We first consider whether defendants Pachiano and R.T.C. are uninsured motorists.

The trial court held that defendants Pachiano and R.T.C. were uninsured motorists under the Insurance Code of the State of Kansas, citing K.S.A. 40-285. The court concluded that the existence of a state insolvency fund for protection of its insureds did not prevent a motorist from being uninsured.

The trial court began its analysis by examining the following definition of an uninsured motor vehicle, which is contained in the Insurance Code of the State of Kansas:

"For the purpose of this act, the term 'uninsured motor vehicle' shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified herein because of insolvency." K.S.A. 40-285.

The Kansas Fire & Casualty policy contains similar language. Because defendants' insurance carrier was insolvent, the vehicle

driven by Pachiano was an uninsured motor vehicle under Kansas law. Although the trial court found no Kansas appellate decisions on point, it concluded that existence of the state insolvency fund did not prevent a motorist from being uninsured.

However, since the decision by the trial court, this court has held that, even though an insolvency fund exists, an insured motor vehicle for which the insurer is insolvent is still an uninsured motor vehicle under K.S.A. 40-285. In *Hetzel v. Clarkin*, 244 Kan. 698, 772 P.2d 800 (1989), this court addressed Kansas law regarding the issue now being argued by intervenor. In *Hetzel*, plaintiff sued Clarkin for damages she sustained when injured in an automobile accident. Clarkin's insurance carrier was insolvent. We said: "An insured motor vehicle is considered to be an uninsured motor vehicle where the insurer of the vehicle is insolvent. K.S.A. 40-285." 244 Kan. at 701. Clearly, defendants Pachiano and R.T.C. are uninsured motorists.

We next consider the trial court's finding that, once defendants were determined to be uninsured motorists, plaintiffs were required to exhaust their own personal uninsured motorist coverage before they were entitled to recover any benefits from the Georgia Insurers Insolvency Pool. As noted by the trial court, this issue is closely related to the question of whether the defendants are uninsured motorists.

Intervenor argues that the trial court erred in determining that the Georgia Insurers Insolvency Pool was liable for excess coverage only, and that defendants Pachiano and R.T.C. were thus uninsured motorists under Kansas law. Intervenor argues first that Georgia statutes unambiguously require the insolvency pool to undertake all obligations of an insolvent insurer of a Georgia defendant. The statute relating to the transfer of the insolvent insurer's obligations to the insolvency pool provides, in part:

"In the event an insurer is determined to be insolvent, the coverage afforded by property and casualty insurance polices issued by such insurer shall, with respect to *covered claims*, become the obligation of the pool for a period of 30 days from the date of such determination or until policy expiration date if less than said 30 days or until the policy has been replaced by the insurer within said 30 days. The pool shall be deemed to be the insurer for such period with respect and to the extent of the claims with all the rights, duties, and obligations of the insolvent insurer; and the pool is authorized to investigate, adjust, compromise, and settle covered claims or to investigate, handle, and deny noncovered claims." (Emphasis added.) Ga. Code Ann. § 33-36-9 (1982).

The claims asserted against defendants Pachiano and R.T.C. were included within the definition of "covered claims" by the Georgia insolvency pool as defined in Ga. Code Ann. § 33-36-3(2)(A) (1988 Supp.).

Intervenor argues that Georgia law does not require exhaustion of uninsured motorist coverage by these plaintiffs before recovering from the Georgia insolvency pool. The Georgia statute setting out what remedies an insured must exhaust before triggering the rights under the insolvency pool provides:

"(a) Any person, including any individual, partnership, association, or corporation, having a claim against his *insurer* under any insolvency provision contained in his insurance policy, which claim arises out of the insolvency of a participating insurer, *shall be required to exhaust first his rights under the policy*; and his rights to recover such claim under this chapter shall be reduced accordingly.

"(b) Any amount paid a claimant in excess of the amount authorized by this chapter may be recovered by an action brought by or on behalf of the pool." (Emphasis added.) Ga. Code Ann. § 33-36-14 (1982).

Intervenor argues the term "insurer" in § 33-36-14 is specifically defined in the Georgia Insurance Code to apply only to insurers doing business in Georgia. This statute provides:

" 'Insurer' or 'company' means any corporation or organization that has held or currently holds a license to engage in the writing of property or casualty insurance policies in this state since July 1, 1970 . . . ." Ga. Code Ann. § 33-36-3(5) (1988 Supp.).

According to intervenor's argument, it is not an "insurer" as defined by § 33-36-3(5) because it has never been licensed to engage in writing insurance policies in Georgia and, therefore, the requirement that a person exhaust remedies by making a claim "against his insurer" in Ga. Code Ann. § 33-36-14 does not apply to it. Since the Georgia statute does not require exhaustion of *all* collateral benefits from *any* source whatsoever, but only those benefits payable by insureds licensed in Georgia, plaintiffs are not required to exhaust their uninsured motorist coverage from Kansas Fire & Casualty before enforcing an obligation of the insolvency pool. In effect, intervenor argues that the Georgia insolvency pool assumes the liability for Pachiano and R.T.C., making them "insured" rather than "uninsured" motorists. We do not agree.

The Georgia appellate courts have not addressed intervenor's argument. The purpose behind the creation of such insolvency

funds, however, is to avoid financial loss to claimants and policyholders due to the insolvency of insurance companies. *Hetzel*, 244 Kan. 698. Georgia law requires a claimant to exhaust his or her own uninsured motorist coverage if he or she has it. The Georgia fund was created to protect claimants who are injured by motorists who are insured by insolvent Georgia companies and who have no other remedy. Once it is determined that a motorist is uninsured, Georgia requires the claimant to exhaust any right under his or her own policy, wherever that may arise, before becoming entitled to recovery from the Georgia fund. However, Kansas law must be reviewed to determine whether these plaintiffs are entitled to recover from their insurers. In *Hetzel*, 244 Kan. at 700, we noted that the Kansas Insurance Guaranty Association Act (the Guaranty Act) provides a fund to cover claims against insolvent insurance companies that arise before insolvency is determined or within 30 days thereafter. K.S.A. 40-2906(a)(1). The Kansas statute requiring exhaustion of uninsured motorist coverage provides:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim shall be required *to exhaust first his right under such policy*. Any amount payable on a covered claim under this act shall be reduced by the amount of *any recovery* under such insurance policy." (Emphasis added.) K.S.A. 40-2910(a).

We concluded: "A statutory blending of K.S.A. 40-2910(a), 40-284, and 40-285 requires an auto accident plaintiff asserting a claim against a defendant whose insurer is insolvent to first assert a claim under his or her own uninsured motorist policy provisions." 244 Kan. at 701.

Since defendants Pachiano and R.T.C. are uninsured motorists, plaintiffs would be required to exhaust the uninsured motorist coverage of their own personal insurance policies before making any claim against the provisions of the Kansas insolvency fund. The fund is liable only for the difference between the limits of a plaintiff's uninsured motorist coverage and the limits on a defendant's policy issued by the insolvent insurer. The legislative purpose in creating the guaranty fund in Kansas was "to avoid financial loss to claimants and policyholders because of the insolvency of insurance companies." 244 Kan. at 705. The fund was also designed to "put claimants and policyholders in the same position in which they would have been had the

policyholders' insurance company remained solvent." 244 Kan. at 706.

Kansas Fire & Casualty urges us to adopt the analysis in *Hickerson v. Protective Nat. Ins. Co.*, 383 So. 2d 377 (La. 1980), where the court held the Louisiana Insurance Guaranty Association was responsible for all obligations of an insolvent insurer, allowing plaintiff to recover without attempting to exhaust her own uninsured motorist policy. In *Hetzel*, we considered but rejected the analysis in *Hickerson* because the provisions of K.S.A. 40-285 define vehicles insured by insolvent companies as uninsured motor vehicles. 244 Kan. at 702-03. Georgia law also defined an uninsured motor vehicle to include those vehicles in which the insurer is insolvent and cannot make either full or partial payment. Ga. Code Ann. § 33-7-11(b)(1)(D)(iv) (1988 Supp.).

In the present case, plaintiffs had uninsured motorist coverage. Pursuant to K.S.A. 40-285, defendants' insured motor vehicle was considered to be uninsured because the insurer of the vehicle is insolvent. Plaintiffs are entitled to assert their rights pursuant to K.S.A. 40-2910(a) under the uninsured motorist policy provided by intervenor. Although the Georgia and Kansas statutes are not identical, under Georgia statutes defendants would also be uninsured due to the insolvency of their insurer, requiring claimants to exhaust remedies under their own uninsured motorist policy provisions before proceeding against the Georgia fund. The trial court correctly found that defendants are uninsured motorists, and plaintiffs must first exhaust their uninsured motorist coverage with Kansas Fire & Casualty.

Kansas Fire & Casualty next argues that the district court plainly granted subrogation rights in its favor against Pachiano and R.T.C. based upon the following language contained in the journal entry of judgment:

"The subrogation rights of Kansas Fire and Casualty Company are merged, as a matter of law, into the judgments entered in favor of the various plaintiffs. To the extent that Kansas Fire and Casualty Company pays uninsured motorist benefits to any plaintiff, it shall be entitled to reimbursement from any judgment proceeds *collected from defendants and Pachiano and R.T.C. Transportation, Inc.*"

The end of the sentence, which is italicized in the quote above, was added in type different from that contained in the rest of the journal entry. It is unclear to whom the term "defendants" refers in this italicized phrase. This journal entry of judgment was

amended by a nunc pro tunc order "to show the entry of judgment against defendant Carrier Insurance Company in the same manner as judgment was entered against R.T.C. Transportation, Inc. The judgment against those two defendants shall be considered joint." Kansas Fire & Casualty argues that allowing it reimbursement for any judgment proceeds collected from other defendants is the equivalent of granting it subrogation rights against the defendants. We do not agree.

Subrogation has been defined as

"the substitution of one person in the place of another with reference to a lawful claim or right. . . . It is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it. It is the machinery by which the equities of one man are worked out through the legal rights of another." 73 Am. Jur. 2d, Subrogation § 1, pp. 598-99.

Subrogation involves comparing equities and is rooted in the doctrine of justice and equity, not contract. *United States Fidelity & Guaranty Co. v. Maryland Cas. Co.*, 186 Kan. 637, 643, 352 P.2d 70 (1960).

In ruling upon Kansas Fire & Casualty's motion for summary judgment, the trial court noted that the Georgia statute creating and controlling the Georgia Insurers Insolvency Pool prevents subrogation proceedings against Pachiano or R.T.C. The applicable statute, Ga. Code Ann. § 33-34-3(d)(1) (1988 Supp.), states:

"Insurers and self-insurers providing benefits without regard to fault described in Code Sections 33-34-4 and 33-34-5 shall not be subrogated to the rights of the person for whom benefits are provided except:

"(A) In those motor vehicle accidents involving two or more vehicles, at least one of which is a motor vehicle weighing more than 6,500 pounds unloaded; or

"(B) Benefits provided for coverage described in paragraph (3) of subsection (a) of Code Section 33-34-5.

The right of recovery and the amount of recovery shall be determined on the basis of tort law between the insurers or self-insurers involved. Expenses incurred in exercising the rights of subrogation under this Code section shall be at the sole expense of the insurers and self-insurers involved. If the responsible tort-feasor is uninsured and is not a self-insurer, the insurer or self-insurer providing benefits shall have a right of action to the extent of benefits provided against such tort-feasor only in the event that the person for whom benefits are provided has been completely compensated for all economic and noneconomic losses incurred as a result of the motor vehicle accident."

This statute distinguishes subrogation rights between two insurers from those between a subrogated insurer and an uninsured tortfeasor. *Travelers Ins. Co. v. Commercial Union Ins. Co.*, 176 Ga. App. 305, 307, 335 S.E.2d 681 (1985). Generally, an

insurer is not entitled to subrogation against an uninsured tort-feasor unless the claimant has been completely compensated. Before the claimant's insurer has subrogation rights against the tortfeasor, it must be established that the tortfeasor is actually uninsured. Here, R.T.C. and Pachiano are insured but their insurer is insolvent. Under Georgia law, the tortfeasor is considered uninsured under the provisions of the subrogation statute only if the person has no insurance or is not a self-insurer. *Aetna Casualty & Surety Co. v. Sosebee*, 150 Ga. App. 354, 258 S.E.2d 37 (1979). Because R.T.C. and Pachiano had insurance, under Georgia law they are are not subject to the subrogation rights of Kansas Fire & Casualty, whose only subrogation rights would be against the insolvent insurer.

No Kansas cases have specifically examined whether an uninsured motorist insurer who must pay uninsured motorist coverage may pursue subrogation interests against the Kansas insurance guaranty fund or an insured whose company is insolvent. Unlike Georgia, the Kansas statutes do not explicitly prohibit it. The purpose for enacting the Kansas Insurance Guaranty Association Act was set forth in K.S.A. 40-2901 as follows:

"The purpose of this act is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and *to avoid financial loss to claimants or policyholders because of the insolvency of an insurer*, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers. This act shall be liberally construed to effect such purpose which shall constitute an aid and guide to interpretation." (Emphasis added.)

The Act contains no reference to Kansas Fire & Casualty's argument that the purpose of insolvency funds is to spread the cost of paying claims by insolvent insurers over the entire insurance industry. The provisions of K.S.A. 40-2903(c) seem to prohibit subrogation of the fund by insurers by limiting those claims covered by the Act. Under the second sentence of this definitional provision, a "[c]overed claim" does not "include any amount due any reinsurer, insurer, insurance pool or underwriting association, as subrogation recoveries or otherwise." K.S.A. 40-2903(c).

Subrogation of a defendant tortfeasor, who was insured by an insolvent insurer, would violate the stated purposes for the enactment of the Guaranty Association Act. The New Jersey Superior Court in addressing this issue interpreted the "pur-

pose" stated in the New Jersey statute that is virtually identical to that contained in K.S.A. 40-2901. In *Sandson's Bakery v. Glover*, 162 N.J. Super. 225, 392 A.2d 640 (1978), the court noted that the New Jersey Property-Liability Insurance Guaranty Association Act was enacted "to provide protection from insolvent insurers not only to innocent injured third parties . . . but also to those insured by an insurer that becomes insolvent." 162 N.J. Super. at 226. Similarly, in Kansas the Guaranty Act was intended "to avoid financial loss to . . . policyholders because of the insolvency of an insurer." K.S.A. 40-2901.

In denying summary judgment, the trial court correctly concluded Kansas Fire & Casualty was not entitled to subrogation against R.T.C. and Pachiano as tortfeasors. The Georgia statutes explicitly barred Kansas Fire & Casualty from subrogation rights against R.T.C. and Pachiano. The purposes behind the Kansas statutes also require a finding that, under Kansas law, Kansas Fire & Casualty cannot recover from R.T.C. and Pachiano. Therefore, the decision of the district court denying the motion for summary judgment was correct. Kansas Fire & Casualty should be reimbursed for any proceeds plaintiffs receive from Pachiano and R.T.C., but it has no right through subrogation to enforce the judgment against these defendants.

Intervenor next argues that the district court erroneously held that the personal liability umbrella policy contains uninsured motorist coverage under Kansas law. The Mohan family had two policies of insurance with Kansas Fire & Casualty. One was an automobile liability policy, No. PIC 3629, with coverage limits of $300,000 per accident. The second was a personal liability umbrella policy providing liability insurance coverage with an "ultimate net loss" in excess of the $300,000 limit on the underlying policy No. PIC 3629, and a maximum limit of $1 million per occurrence. The umbrella policy was conditional upon maintenance of the underlying primary policy. The parties agree that the umbrella policy does not expressly mention uninsured motorist coverage.

The issue we must decide is whether Kansas law required the umbrella policy to include uninsured motorist protection pursuant to K.S.A. 1988 Supp. 40-284(a). This statute requires that all "automobile liability insurance" policies offer uninsured motorist coverage with limits equal to that of the coverage provided for

bodily injury or death in the same policy. If the Kansas Fire & Casualty umbrella policy is an "automobile liability insurance policy" within the meaning of K.S.A. 1988 Supp. 40-284(a), it must be deemed to have included uninsured motorist coverage.

Kansas Fire & Casualty argues that at the time K.S.A. 40-284 was originally enacted in 1968, the term "automobile liability policy" was a term of art. According to this argument, to be an automobile liability insurance policy, the policy itself must insure the operation of a specified motor vehicle or a specified individual operating a non-owned vehicle as defined in K.S.A. 8-728(a)(1) or (2) (Corrick). Plaintiffs point out that the Motor Vehicle Safety Responsibility Act (K.S.A. 8-722 *et seq.* [Corrick]) relied upon by Kansas Fire & Casualty was repealed in 1974. Kansas Fire & Casualty, however, argues that the Court of Appeals recognized that the term "automobile liability policy" had a special sense and was not to be given its ordinary, common usage through the enactment of 40-284. Both intervenor and plaintiffs cite *Klamm v. Carter*, 11 Kan. App. 2d 574, 730 P.2d 1099 (1986), to support their respective positions on this issue. We find no support for intervenor's position in *Klamm*. In *Klamm*, the Court of Appeals compared the use of the terms "automobile" and "motor vehicle." After comparing the way in which these terms were used in the Motor Vehicle Safety Responsibility Act, the Kansas Automobile Injury Reparations Act, and the uninsured motorist provisions of K.S.A. 40-284(a) and (e), the court concluded that "when mandating certain coverages for insurance on motor vehicles, our legislature at times appears to use 'automobile' and 'motor vehicle' interchangeably." 11 Kan. App. 2d at 579. The court concluded that the term "automobile" used in K.S.A. 40-284 did not refer to four-wheeled vehicles only, but also included all motor vehicles "and was used this way because it was the most convenient substitute once the generic 'motor vehicle' had been commandeered for special use under the MVSRA." 11 Kan. App. 2d at 580.

Kansas Fire & Casualty urges this court to interpret K.S.A. 1988 Supp. 40-284(a) to not impose mandatory uninsured motorist coverage on personal catastrophe or umbrella policies, arguing this is what the clear majority of jurisdictions have decided. Kansas appellate courts have not addressed this issue. The decisions from other jurisdictions are divided. As the district court in

this case noted, "some hold that an umbrella policy is an automobile liability policy and must offer uninsured motorist coverage . . . while the others hold that an umbrella policy need not offer uninsured motorist coverage." Rather than classifying the decisions of other jurisdictions as a majority or minority rule, however, the court below noted that the differing decisions stem from the policy considerations and legislative intent underlying each state's uninsured motorist statutes. The district court analyzed these cases in the following discussion:

"Where the statute merely requires that motorists maintain a minimum level of liability insurance, which in turn means that only a minimum level of uninsured motorist coverage is required, the courts generally hold that such a statute does *not* apply to umbrella policies. The reasons for those decisions were most recently summed up in *Continental Ins. Co. v. Howe*, 488 So. 2d 917 (Fla. Dist. Ct. App. 1986) as follows:

" 'The rationale for opting umbrella policies out of uninsured motorist coverage [in minimum liability statutes] is that the statute is intended to protect injured motorists by insuring that they will be able to recover an amount equivalent to what would have been available if they had been injured by a driver who maintained the minimum statutory coverage. The injured motorist is already protected by, and will be able to recover the minimum statutory limits from, the primary policy. An umbrella policy is supplementary insurance. Public policy is not furthered by requiring an umbrella policy insurer to provide uninsured motorist coverage.' (Citations omitted.)

[488 So. 2d] at 919.

"On the other hand, some statutes require a liability insurer to provide uninsured motorist coverage equivalent to the amount of bodily injury liability coverage. In these states, the courts generally hold that umbrella policies fall within the statute requiring uninsured motorist coverage. The reasons for these decisions were also summed up in *Continental Ins. Co. v. Howe*, . . . where the court stated:

" 'Three states, Florida, Ohio, and Louisiana, have construed their statutes to include umbrella polices. However, these states have a different type of statute. Section 627.727(2), Florida Statutes (1985), requires a liability insurer to provide uninsured motorist coverage in "not less than the limits of bodily injury liability insurance." The policy underlying the statute is to allow *full* recovery under the terms of any applicable policies when a person is injured by an uninsured motorist. Florida courts had construed the statute to include umbrella policies.' (Citations omitted.)

[488 So. 2d] at 919-20. Therefore, in short, the decisions were based on the differences in the statutes. States which have statutes designed to provide a minimum level of recovery hold that the umbrella policies do not fall within the uninsured motorist statute, while states that have statutes designed to provide full recovery hold that the umbrella policy does fall within the uninsured motorist statute and must offer uninsured motorist coverage."

The importance of the language of the individual statutes is

emphasized in the decision by the Louisiana Supreme Court in *Southern Am. Ins. v. Dobson*, 441 So. 2d 1185 (La. 1983). The Louisiana statute in question provides, in pertinent part:

"No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state . . . unless coverage is provided therein or supplemental thereto, *in not less than the limits of bodily injury liability provided by the policy* . . . ." (Emphasis added.) La. Rev. Stat. Ann. 22:1406(D)(1)(a)(i) (West 1989 Supp.).

When the court first considered the issue, it held that a commercial umbrella liability policy was not an automobile liability insurance policy within the meaning of the statute. The court, relying upon the majority of decisions by courts in other jurisdictions, concluded that an umbrella policy is entirely different from the automobile liability insurance policy contemplated by the uninsured motorist law.

Upon rehearing, the court reversed its decision and found the statute requiring the providing of uninsured motorist coverage to be applicable to commercial umbrella policies. In explaining its reversal, the court noted that the original decision placed considerable emphasis on decisions from other states but failed to appreciate that the uninsured motorist statutes in those states differed significantly from the Louisiana statute. 441 So. 2d at 1190. The crucial language of the statute was the requirement that the insurer provide coverage "in not less than the limits of bodily injury liability provided by the policy." La. Rev. Stat. Ann. 22:1406(D)(1)(a)(i) (West 1989 Supp.). Originally, the Louisiana uninsured motorist statutes protected a motorist only to the same extent as if the person who had struck him had complied with the minimum requirements of the motor vehicle responsibility law. Amendments to the Act, however, changed the liability limits from mandatory uninsured motorist coverage to coverage equal to the limits of bodily injury liability provided by the policy. Additional amendments eliminated the limit on uninsured motorist coverage and now allow an insured to increase his coverage to any amount. The court noted: "Our legislature has thus progressed from allowing only limited recovery to the innocent victim to permitting the insured to choose the maximum limits of his uninsured motorist coverage." 441 So. 2d at 1191. The Louisiana court recognized that the legislative purpose behind the statutes of many jurisdictions requires unin-

sured motorist coverage only in minimum amounts required by law, 441 So. at 1191, and stated as follows:

"The effect of today's decision will be to require insurance companies doing business in this state to offer uninsured motorist coverage to an insured under the provisions of umbrella and excess policies when those policies cover 'liability arising out of the ownership, maintenance, or use of any motor vehicle.' The procedure will thus become the same as that for primary policies providing such coverage. If the insured, after having been informed of the (presumably higher) cost, declines such coverage, then the insurance company should have the insured execute a written waiver. Thus insureds in Louisiana will henceforth be in a position to make informed choices, and the costs can be allocated accordingly." 441 So. 2d at 1192.

The key to deciding this issue lies in the language of the Kansas statute. Although no Kansas appellate decisions have addressed this issue, 40-284 was interpreted by the Hon. Patrick F. Kelly in *Smith v. Ruiz*, Case No. 83-6018-K (D. Kan. Sept. 19, 1984). Judge Kelly rejected the argument that uninsured motorist coverage did not exist under the umbrella policy, noting:

"The whole purpose behind umbrella coverage is to assure that adequate coverage exists, i.e., that umbrella coverage picks up where the underlying policy leaves off. In this case, the underlying policy limit is $250,000.00 per person and $500,000.00 per accident. The umbrella policy limit is $5,000,000.00. This Court fails to see how UM [uninsured motorist] coverage could exist under the underlying policy but not under the umbrella policy. UM coverage is part of the underlying policy. As part of the underlying policy, it is part of the umbrella policy because the umbrella policy specifically identifies the underlying policy. In addition, the umbrella policy professes to continue as underlying insurance at the exhaustion of coverage in the underlying policy." (*Smith v. Ruiz*, Slip op. at 6.)

The accident in the present case occurred on July 16, 1984. Although 40-284 has been amended since then, the provision of the statute in effect at the time of the accident and which applies to this case remains the same and provides as follows:

"(a) No automobile liability insurance policy covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state, unless the policy contains or has endorsed thereon, a provision with coverage limits *equal to the limits of liability coverage for bodily injury or death in such automobile liability insurance policy sold to the named insured* for payment of part or all sums which the insured or the insured's legal representative shall be legally entitled to recover . . . ." (Emphasis added.) K.S.A. 1988 Supp. 40-284.

The italicized portion indicates that this statute, like that of

Louisiana discussed in *Dobson*, provides for full recovery. Other jurisdictions that have analyzed similar statutes providing for full recovery of the limits of a liability policy interpret umbrella policies to fall within the uninsured motorist statute and require uninsured motorist coverage.

A review of the legislative history of this statute emphasizes the importance of this language. In 1981, the language italicized above in 40-284(a) replaced the following italicized language:

". . . unless the policy contains or has endorsed thereon, a provision with coverage limits *not less than the limits for bodily injury or death set forth in K.S.A. 1967 Supp. 8-729, providing* for payment of part or all sums which the insured . . . shall be legally entitled to recover . . . ." K.S.A. 40-284(a) (Weeks).

Originally, the statute provided a minimum level of recovery that other jurisdictions have interpreted to exclude uninsured motorist coverage from umbrella policies. Several courts were addressing the issue presented in this case at the time the Kansas Legislature made the change in 1981. *O'Hanlon v. Hartford Acc. & Indem. Co.*, 639 F.2d 1019 (3d Cir. 1981); *Matarasso v. Continental Cas. Co.*, 82 App. Div. 2d 861, 440 N.Y.S.2d 40 (1981), *aff'd* 56 N.Y.2d 264, 451 N.Y.S.2d 703, 436 N.E.2d 1305 (1982); *Trinity Universal Ins. Co. v. Metzger*, 360 So. 2d 960 (Ala. 1978). These were among the cases considered by the Louisiana court in *Dobson* when it reached its first decision.

The 1981 amendment to the Kansas statute that is crucial to this case was the first change since its enactment in 1968. The inclusion of this provision shows the intent of the Kansas Legislature to allow for more than a minimum recovery. This court discussed the policy behind uninsured motorist coverage in *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, 600, 549 P.2d 1354 (1976):

"Uninsured motorist coverage was developed as a means of protecting the non-negligent motorist where the tortfeasor is uninsured. The typical clause provides a motorist who carries a standard automobile liability policy with rights against his own insurance company equal to those he would have against the uninsured tortfeasor. The purpose of such coverage was discussed by this court in *Winner v. Ratzlaff*, 211 Kan. 59, 505 P.2d 606, wherein we said:

" '. . . The purpose of legislation mandating the offer of uninsured motorist coverage is to fill the gap inherent in motor vehicle financial responsibility and compulsory insurance legislation and this coverage is intended to provide recompense to innocent persons who are damaged through the wrongful conduct of motorists who, because they are uninsured and not financially responsible, cannot be made to respond in damages. . . .' (pp. 63, 64.)"

In making the changes in 1981, the legislature was merely allowing additional protection from uninsured motorists. Because of that change, we interpret 40-284 to require umbrella policies issued in this state requiring maintenance of an underlying primary policy to include uninsured motorist coverage. We do not agree with intervenor that such an interpretation violates K.S.A. 1988 Supp. 40-284(d). The 1981 amendment to 40-284 included the following addition:

"(d) Coverage under the policy shall be limited to the extent that the total limits available cannot exceed the highest limits of any single applicable policy, regardless of the number of policies involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid or vehicles involved in an accident."

The intent of the legislature in mandating uninsured motorist coverage is to allow an injured insured to recover to the extent of the damages caused by an uninsured motorist. To that end, this court has permitted an injured insured party to "stack" uninsured motorist coverage. *Welch v. Hartford Casualty Ins. Co.*, 221 Kan. 344, 559 P.2d 362 (1977); *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595; *Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 457 P.2d 34 (1969). In *Sturdy*, we said:

"It must be borne in mind the purpose of uninsured motorist insurance is to provide compensation for personal injury to the innocent victim of the uninsured motorist. As to the named insured the coverage is a contract benefit for which he has paid. Here the damage to the insured has been determined and he now seeks indemnity for it. He is not seeking any windfall as a result of his injury but he is seeking full indemnity based on payment of two separate premiums. Applying traditional rules of construction we think he is entitled to that coverage." 203 Kan. at 792-93.

In *Welch*, we held:

"It appears on reading our previous uninsured motorist cases including *Rosson v. Allied Mutual Ins. Co.*, [203 Kan. 795, 457 P.2d 42 (1969)], that the phrase 'legally entitled to recover' in the statute refers to the extent of the damages caused by the fault of the uninsured motorist, that an insured may 'stack' coverages to obtain the recompense for said damages, but that the total amount to be received from stacked coverages should not exceed the full amount of damages sustained.

. . . .

"We hold where more than one insurance policy provides uninsured motorist coverage with respect to damages sustained in a single accident caused by fault on the part of an uninsured motorist the insured injured party may 'stack' coverages up to but not more than the full amount of the damages sustained. An

insured injured party covered by one or more policies providing uninsured motorist coverage mandated by K.S.A. 40-284 is entitled to recover the same amount he or she would have recovered if the offending uninsured motorist had maintained adequate liability insurance, provided the collective coverages available are equal to or exceed the full amount of the damages." 221 Kan. at 349-50.

The legislature, by limiting recovery to one single policy and increasing the limits of the mandated offer, did not alter the original intent of the statute but only the means to accomplish it. The legislature, in amending 40-284, clearly expressed a preference for providing uninsured motorist coverage in a single policy. The umbrella policy in the instant case is not a separate policy of insurance but, rather, a supplemental policy. Coverage and therefore recovery is not dependent upon "stacking" two separate primary policies. By its own terms, the umbrella policy extends the limits of the underlying primary policy, and no coverage exists under the umbrella policy until the limits of the underlying policy are exhausted. The underlying policy and the umbrella policy are one single policy for the purposes of determining coverage under K.S.A. 1988 Supp. 40-284(d).

We therefore find that the trial court did not err in holding that the umbrella policy of Kansas Fire & Casualty includes uninsured motorist protection, thus allowing for full recovery. As the district court noted: "The statute insures that motorists are protected against loss caused by uninsured motorists to the same extent they themselves provide protection for the rest of the world." Here, the primary policy provided protection of $300,000. Once that coverage is exhausted, the umbrella policy becomes available with a limit of $1 million. Therefore, in this case, the total uninsured motorist coverage available is actually $1,300,000.

Intervenor finally argues that the plaintiffs lost their right to seek uninsured motorist coverage by settling their claims with Kansas Turnpike Authority and Reece Construction. Prior to the trial on the issues of damages and liabilities, all plaintiffs settled their claims against defendants Kansas Turnpike Authority and Reece Construction. These settlement agreements were reached without the consent of Kansas Fire & Casualty. After learning of the settlements, Kansas Fire & Casualty sought to have the claim for uninsured motorist coverage voided because the plaintiffs had released a tortfeasor without Kansas Fire & Casualty's au-

thority. The district court denied Kansas Fire & Casualty's motion for summary judgment. At the trial, the court found the following total damages:

| | |
|---|---|
| Jennifer Bartee | $373,333.00 |
| Janine Mohan | 105,882.40 |
| Richard Moranz | 100,000.00 |

Kansas Turnpike Authority was found to be 5% at fault and Reece Construction to be 10% at fault. The damages were reduced by these percentages. On October 7, 1988, the court entered judgment against the remaining defendants, Pachiano and R.T.C., in the following amounts:

| | |
|---|---|
| Jennifer Bartee | $317,333.00 |
| Janine Mohan | 90,000.00 |
| Richard Moranz | 85,000.00 |

Kansas Fire & Casualty argues that plaintiffs are barred from their uninsured motorist coverage because the settlements with Kansas Turnpike Authority and Reece Construction prior to trial abrogated the subrogation rights of Kansas Fire & Casualty. These rights are set forth at K.S.A. 40-287:

"The policy or endorsement affording the coverage specified in K.S.A. 40-284 may further provide that payment to any person of sums as damages under such coverage shall operate to subrogate the insurer to any cause of action in tort which such person may have against any other person or organization legally responsible for the bodily injury or death because of which such payment is made, and the insurer shall be subrogated, to the extent of such payment, to the proceeds of any settlement or judgment that may thereafter result from the exercise of any rights of recovery of such person against any person or organization legally responsible for said bodily injury or death for which payment is made by the insurer. Such insurer may enforce such rights in its own name or in the name of the person to whom payment has been made, as their interest may appear, by proper action in any court of competent jurisdiction."

Through this statute, an insurer is subrogated to those parties who may be legally obligated to pay for the injuries for which the insured has contracted with the insurer to cover, namely uninsured motorist payments. The policy provisions in question in this case provide, in part, as follows:

"EXCLUSIONS
"A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by any person:
"1. If that person or the legal representative accepts a settlement or secures a judgment for a bodily injury claim that prejudices our right to recover payment. . . .

. . . .

"PART F **GENERAL PROVISIONS**

. . . .

"5. **OUR RIGHT TO RECOVER PAYMENT**
"A. If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do whatever is necessary to enable us to exercise our rights and shall do nothing after loss to prejudice them."

"**PERSONAL CATASTROPHE POLICY**

. . . .

"D. **SUBROGATION**: The Company shall be subrogated to the extent of any payment    hereunder to all the Insured's rights of recovery therefor; and the Insured shall do everything necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights."

The settlement documents signed by the plaintiffs all include the following clause: "We expressly reserve and retain all of our claims, causes of action, rights of recovery, etc. against those other parties in [this case]." Neither Kansas Turnpike Authority nor Reece Construction are uninsured motorists; instead, they are third-party tortfeasors. The issue is whether the settlement of plaintiffs with third-party tortfeasors precludes their claim against Kansas Fire & Casualty for uninsured motorist coverage. We conclude it does not.

Both parties rely upon this court's decision in *Benson v. Farmers Ins. Co.*, 227 Kan. 833, 610 P.2d 605 (1980), to support their respective arguments. Plaintiff Benson was injured when his motorcycle was struck by defendant Beers' automobile. Benson was insured by Farmers; Beers, having just purchased the car, had no insurance. The previous owner's insurance company, Casualty Reciprocal Exchange, agreed upon demand to defend Benson's suit against Beers but denied that Beers had the right to protection. Benson demanded uninsured motorist coverage of Farmers, which intervened. Benson then settled with Casualty for $10,000 and agreed not to sue Casualty. Beers, who was involved in the settlement, could still be sued by Farmers. Because Farmers did not consent to the agreement in writing as required under its policy, Farmers filed a motion for summary judgment, arguing that the settlement triggered the exclusion provision of its policy with Benson because the agreement impaired Farmers' subrogation rights without its consent. The trial court granted the motion.

In affirming the decision, this court quoted extensively from the opinion by the trial court. We noted that uninsured motorist coverage was required " 'to fill the gap inherent in motor vehicle financial responsibility and compulsory insurance legislation and . . . to provide recompense to innocent persons who are damaged through the wrongful conduct of motorists who . . . cannot be made to respond in damages.' " 227 Kan. at 837 (quoting *Winner v. Ratzlaff*, 211 Kan. 59, 63-64, 505 P.2d 606 [1973]). The trial court concluded that Benson's settlement with Casualty prevented Farmers from pursuing any action against Casualty. Many jurisdictions uphold insurance policy provisions that exclude uninsured motorist coverage when a settlement is made without authority. In *Benson*, this court stated: "Most courts have upheld such exclusions as protecting the insurer's legitimate right to subrogation. [Citations omitted.] In other jurisdictions, the exclusion of coverage for unauthorized settlement has been held invalid when applied to settlement with an insured third-party tortfeasor." 227 Kan. at 838. Kansas Fire & Casualty finds comfort from the first sentence of this quote, while plaintiffs find comfort in the second sentence.

The exclusion clause in *Benson* was found valid and enforceable because release of Casualty limited Farmers' ability to recover payments to proceedings against defendant Beers, which substantially impaired Farmers' rights to subrogation. The policy excluded uninsured motorist coverage when the insured, without the written consent of its insurer, settled with someone *who may be legally liable*. To interpret this language, the court examined the decision in *La Bove v. American Employers Insurance Company*, 189 So. 2d 315, 317 (La. App. 1966). The Louisiana court held that application of a policy provision identical to that in *Benson* was not restricted to a settlement with the uninsured motorist, but included settlement with any person who "possibly, perhaps, or by chance may be found liable at the trial." The court in *La Bove* relied in part upon the Kansas Supreme Court's interpretation of the words "may be" to mean possibly, perhaps, or by chance. *State v. Howland*, 153 Kan. 352, 360, 110 P.2d 801 (1941). The court in *Benson* concluded that the policy was unambiguous and, because the settlement was made without the written consent of Farmers with a person who may be legally liable for plaintiff's damages, the uninsured motorist

coverage under Farmers' policy was excluded and inapplicable to the injuries suffered by Benson. 227 Kan. at 840.

Our decision in *Benson* was limited to the facts of that case. The facts of *Benson* are distinguishable from those in the instant case. The policy provisions here do not refer to " 'any person or organization *who may be legally liable therefor.*' " 227 Kan. at 834. Furthermore, plaintiffs settled with third-party tortfeasors who had no contractual relationship with the uninsured motorist, Pachiano, or his employer, defendant R.T.C. These defendants were not without insurance, but were deemed uninsured motorists because their insurer was insolvent. Although the exclusion clause contained in the policy here is valid, intervenor was not required to pay under the policy due to the acts of the defendants.

When the Honorable Earl O'Connor applied K.S.A. 40-287 to third-party tortfeasors in *Horace Mann Ins. Co. v. Ammerman,* 630 F. Supp. 114 (D. Kan. 1986), he concluded that the exclusion clause of the policy would not prevent the claim for uninsured motorist coverage because the challenged settlement agreement did not prejudice the subrogation rights of Horace Mann. Judge O'Connor, reviewing *Benson,* concluded an exclusion clause in an uninsured motorist policy was also valid in an *underinsured* motorist policy, but found the facts distinguishable. 630 F. Supp. at 118. In *Ammerman,* the defendants obtained a $200,000 judgment against the uninsured driver and were paid the full $50,000 recoverable from the other driver's policy by her insurance company. Because the limit on Ammerman's policy was $250,000 per person, and defendants in their judgment obtained satisfaction for the entire amount to which Horace Mann could be liable, the court found the exclusion clause was not invoked. 630 F. Supp. at 118. If Horace Mann paid defendants the $200,000 they claimed under the underinsured motorist policy, Horace Mann would have been fully subrogated by the judgment against the other driver. Thus, the court concluded that Horace Mann's rights to subrogation were not impaired but, in fact, were facilitated by defendants' obtaining the judgment against the other driver. Judge O'Connor also concluded that, even if the execution of the release effected a technical violation of the policy, enforcement of that policy provision would be

contrary to Kansas public policy and defendants would still be entitled to summary judgment. The court stated:

"The Kansas public policy 'requiring compensation to innocent persons injured by the tortious conduct of an [underinsured] motorist' *would* be violated if an insurer were allowed to refuse payment on an underinsured motorist policy even after its insured had established the liability of the underinsured motorist. Yet that is the result plaintiff seeks. Because we believe that the Kansas courts would reject such an argument, we will grant defendants' motion for summary judgment." 630 F. Supp. at 119.

Here, the settlement with Kansas Turnpike Authority and Reece Construction did not interfere with the ability of Kansas Fire & Casualty to receive compensation for the tortious conduct of an uninsured motorist. The public policy purpose behind the uninsured motorist provisions is to require compensation of innocent persons who are injured by the tortious conduct of an uninsured motorist. The third-party tortfeasors here were not the reason that Kansas Fire & Casualty is being required to compensate plaintiffs under their uninsured motorist coverage. The conduct of Kansas Turnpike Authority and Reece Construction was considered by the trial court, their involvement in the accident was determined by the court, and plaintiffs' judgment was reduced by the percentage of fault attributable to these two parties. The purpose of subrogation is to give the insurer a right to recoup payments it has made on uninsured motorist coverage from those parties who are responsible for the damages and for which the subrogated insurer has contracted to pay. The subrogation allowed by K.S.A. 40-287 does not guarantee the insurer that it will be reimbursed from any party regardless of how that party's actions contributed to the resulting damages.

Although not the issue, the court in *Benson* recognized that other jurisdictions did not exclude coverage for unauthorized settlement with an insured third-party tortfeasor. 227 Kan. at 838 (citing *Harthcock v. State Farm Mutual Automobile Ins. Co.*, 248 So. 2d 456 [Miss. 1971]; *Government Employees Ins. Co. v. Shara*, 137 N.J. Super. 142, 348 A.2d 212 [1975]; and *Hawaiian Ins. & Guar. v. Mead*, 14 Wash. App. 43, 538 P.2d 865 [1975]). According to these cases, when the settlement is with a third-party tortfeasor and not with the uninsured motorist or his insurer, the exclusion of coverage for unauthorized settlement is invalid. We agree and find that such policy provisions excluding

uninsured motorist coverage for unauthorized settlements are limited to settlements that jeopardize the ability of the insurer to recover from the tortfeasor causing the insurer to provide uninsured motorist coverage.

The judgment of the district court is affirmed.