No. 91,025

EXPLORATION PLACE, INC., DONDLINGER & SONS CONSTRUCTION CO., INC., *Plaintiffs,* and TRAVELERS INSURANCE COMPANY, *Plaintiff/Appellant,* v. MIDWEST DRYWALL CO., INC., *Defendant/Appellee.*

(89 P.3d 536)

Opinion filed May 14, 2004.

*Stephen M. Kerwick,* of Foulston Siefkin, LLP, of Wichita, argued the cause, and *Lew M. Harstead,* of Neuens & Associates, of Greenwood Village, Colorado, was with him on the brief for appellant.

*Kelly S. Kerzik,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and was on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: This case involves interpretation and application of the Kansas Insurance Guaranty Association Act, K.S.A. 40-2901 *et seq.* (Guaranty Act). The district court ruled that the Guaranty Act barred all subrogation claims. Appellant argues that the Act bars only those subrogation claims that would have been covered by the tortfeasor's insolvent insurer.

This action was brought by Exploration Place, Inc. (EPI); Dondlinger and Sons Construction Co., Inc. (Dondlinger); and Dondlinger's insurance carrier, Travelers Insurance Company (Travelers). The plaintiffs sued Midwest Drywall Co., Inc. (Midwest Drywall) for damages resulting from the October 18, 1999, collapse of a suspended ceiling installed by Midwest Drywall during the construction of Exploration Place in Wichita. Dondlinger was the general contractor for the construction project, and Midwest Drywall was a subcontractor.

EPI claimed damages of $191,676 in lost revenue because it had to delay the opening of Exploration Place as a result of the accident. Dondlinger claimed damages of $543,984.71, all of which was reimbursed by Travelers except for Dondlinger's $5,000 deductible.

At the time of the accident, Midwest Drywall had insurance coverage with Reliance National Indemnity Company (Reliance) for commercial general liability up to $1,000,000 per occurrence. Reliance became insolvent and was placed under order of liquidation by the Pennsylvania Commonwealth Court in October 2001.

Midwest Drywall sought partial summary judgment on two grounds. First, Midwest Drywall argued that Dondlinger's negligence claim should be dismissed because Dondlinger should not be allowed to assert a tort theory of recovery in what is essentially a contract action. The district court agreed, granting partial summary judgment on this basis. Travelers does not challenge this portion of the court's ruling.

Second, Midwest Drywall sought summary judgment against Travelers, arguing that the Guaranty Act precluded Travelers' subrogation claims. Again, the district court agreed, granting summary judgment in favor of Midwest Drywall as to Travelers' claim but allowing Dondlinger's $5,000 claim to proceed. Travelers then filed a motion for reconsideration, which the district court denied. Travelers timely appealed. The appeal was transferred to this court on its own motion pursuant to K.S.A. 20-3018(c).

Both Dondlinger and Exploration Place have subsequently resolved their claims against Midwest Drywall, leaving only Travelers and Midwest Drywall involved in this appeal. Travelers was not originally a party to the lawsuit, but was added as an additional party after the other parties' claims were settled. Travelers previously brought its subrogation claim in Dondlinger's name. For ease of reference, where an action was taken or argument made by Dondlinger at the trial court level, this opinion will refer to Travelers as the real party in interest rather than Dondlinger. This is consistent with the parties' references in their briefs.

### Standard of Review

Because this case was decided on a summary judgment motion, Travelers contends that this court should review the case under the usual summary judgment standard of review:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

Midwest Drywall, on the other hand, contends that this court should apply an abuse of discretion standard because the arguments Travelers makes on appeal were first asserted in the district court in a motion to reconsider. Motions to reconsider are generally treated as motions to alter or amend under K.S.A. 60-259(f). *Honeycutt v. City of Wichita*, 251 Kan. 451, 460, 836 P.2d 1128 (1992). The standard of review of the denial of a motion to alter or amend the judgment is an abuse of discretion standard. *Subway Restaurants, Inc. v. Kessler*, 266 Kan. 433, 441, 970 P.2d 526, *cert. denied* 526 U.S. 1112 (1998).

Midwest Drywall's argument is only partially accurate. In its response to Midwest Drywall's motion for summary judgment, Travelers argued that the Guaranty Act specifically required a determination that the claim in question was within the coverage of the insolvent insurer and that a material question of fact remained as to whether Travelers' claims would have fallen within Reliance's coverage. Travelers pointed out that while Midwest Drywall had provided a copy of the declarations page of its policy with Reliance, it had yet to provide a copy of the full policy.

Midwest Drywall filed a reply to Travelers' response to its motion for summary judgment, to which it attached a copy of the full policy. Midwest Drywall argued that the policy clearly would have covered plaintiffs' claims.

In its motion for reconsideration, Travelers argued that a different policy exclusion applied than the one it had relied upon during

its oral argument on Midwest Drywall's summary judgment motion. Thus, Travelers did raise the general issue of coverage during summary judgment proceedings, but it relied specifically upon the work product exclusion only in its motion to reconsider.

Additionally, this case primarily involves the interpretation of the Guaranty Act and the interpretation of an insurance contract. Both are questions of law over which this court exercises unlimited review. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003); *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003).

### Did the District Court Err in Ruling That the Kansas Insurance Guaranty Association Act Barred Travelers' Subrogation Claim Against Midwest Drywall?

The Guaranty Act created an association to provide coverage for claims against insolvent insurance companies which arise before the determination of insolvency or within 30 days thereafter. K.S.A. 40-2906(a)(1); *Hetzel v. Clarkin*, 244 Kan. 698, 700, 772 P.2d 800 (1989). The stated purpose of the Guaranty Act is

"to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers. This act shall be liberally construed to effect such purpose which shall constitute an aid and guide to interpretation." K.S.A. 40-2901.

Thus, "[t]he Guaranty Act was designed to put claimants and policyholders in the same position in which they would have been had the policyholders' insurance company remained solvent." *Hetzel*, 244 Kan. at 706.

The Kansas Insurance Guaranty Association (the Association) is obligated to pay only "covered claims," which are defined as follows:

" 'Covered claim' means an unpaid claim, including one for unearned premiums, *which arises out of and is within the coverage* and not in excess of the applicable limits of an insurance policy to which this act applies issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this act and (1) the claimant or insured is a resident of this state at the time of

the insured event; or (2) the property from which the claim arises is permanently located in this state. *'Covered claim' shall not include any amount due any reinsurer, insurer, insurance pool or underwriting association, as subrogation recoveries or otherwise."* (Emphasis added.) K.S.A. 40-2903(c).

The two italicized parts of the above definition are the ones at issue in this case.

Travelers concedes that the majority of its $543,984.71 subrogation claim is barred by the Guaranty Act, since the definition of "covered claim" generally excludes the subrogation claim of an insurance company. However, Travelers argues that the Act does not bar that portion of the claim which would not have been covered by Midwest Drywall's policy with Reliance. According to Travelers, $142,360 of its subrogation claim was paid to Midwest Drywall to repair and replace the suspended ceiling or, in other words, to perform the same work it had originally performed incorrectly before the ceiling collapsed. Travelers argues this portion of its claim would not have been covered under the Reliance policy because of a work product exclusion.

The policy contained the following exclusions for property damage:

"This insurance does not apply to: . . . '[p]roperty damage' to: . . . [T]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

"This insurance does not apply to: . . . '[p]roperty damage' to 'your work' arising out of it or any part of it. . . ."

Setting aside for the moment the question of whether the above exclusions would actually apply to bar coverage, the first question to be resolved is whether the Guaranty Act bars all subrogation claims against an insured with an insolvent insurer, or only those which fall within the policy's coverage.

The Guaranty Act has been interpreted and applied in only a few prior cases, only two of which relate to the issue before us. In *Bartee v. R.T.C. Transportation, Inc.*, 245 Kan. 499, 781 P.2d 1084 (1989), an uninsured motorist case, the plaintiffs were involved in an automobile accident caused by a tractor-trailer crossing the turnpike median. The plaintiffs sued the driver of the tractor and the owner of the semitrailer rig. The tractor and semitrailer were

insured by a company which became insolvent, thus requiring the Georgia Insurers Insolvency Pool to assume defense of the case. The plaintiffs all sought uninsured motorist benefits from their own insurance carriers, one of which was Kansas Fire & Casualty Company (KFC), an intervenor.

At trial, judgment was entered against the defendants for approximately $500,000. KFC's liability for uninsured motorist coverage was limited to $1.3 million; thus, the district court entered judgment for plaintiffs' damages against KFC. KFC appealed, raising several claims of error, including the claim that KFC had a right of subrogation against the tortfeasor defendants (the driver and owner of the tractor-trailer) for the amounts KFC had paid to the plaintiffs.

After discussing the provisions of Georgia law, this court turned to Kansas law, stating: "No Kansas cases have specifically examined whether an uninsured motorist insurer who must pay uninsured motorist coverage may pursue subrogation interests against the Kansas insurance guaranty fund or an insured whose company is insolvent. Unlike Georgia, the Kansas statutes do not explicitly prohibit it." 245 Kan. at 508. With regard to subrogation claims against the fund, the court found that the provisions of K.S.A. 40-2903(c) seemingly prohibited such claims by defining "covered claim" to exclude "any amount due any reinsurer, insurer, insurance pool or underwriting association, as subrogation recoveries or otherwise." 245 Kan. at 508.

With regard to subrogation claims against a tortfeasor with an insolvent insurer, the court found that allowing such a claim would violate the stated purpose of the Guaranty Act, which is " 'to avoid financial loss to . . . policyholders because of the insolvency of an insurer.' K.S.A. 40-2901." 245 Kan. at 508-09. Thus, the court held that KFC could not maintain a subrogation claim against the tortfeasor defendants. 245 Kan. at 509.

The Court of Appeals extended the holding of Bartee in Maston v. Harper, 18 Kan. App. 2d 739, 859 P.2d 405 (1993). There, the issue was whether an uninsured motorist insurer could bring a subrogation action against the tortfeasor for the difference between

the tortfeasor's policy limit with her insolvent insurer and the amount of stipulated damages.

In *Maston*, the plaintiff Maston sued for injuries she received in an automobile accident caused by the defendant Harper. Harper's policy limits with her insolvent insurer had been $25,000. Maston also named her own uninsured motorist carrier, Shelter, as a defendant. Under her policy, Maston's uninsured motorist benefits were limited to $50,000, but she settled with Shelter for $45,100. Shelter then asserted a subrogation claim against Harper for $5,000, the difference between Harper's policy limits of $25,000 and the amount of stipulated damages, $30,000.

The *Maston* court discussed *Bartee* as follows:

"*Bartee* seems to indicate that an uninsured motorist carrier such as Shelter cannot in any instance exercise subrogation against the insured of the insolvent insurer. This prohibition is appropriate in cases where the damages for which the insured is liable do not exceed the limits of the coverage the insured had with the insolvent insurer. In these instances, making the insured pay or reimburse the uninsured motorist carrier would cause financial loss to the insured because of the insolvency of his or her liability carrier. This result would contravene the Act's express purpose. See K.S.A. 40-2901." 18 Kan. App. 2d at 743.

However, the *Maston* court found that prohibiting Shelter's claim would actually contravene the purpose of the Guaranty Act:

" 'The Guaranty Act was designed to put claimants and policyholders in the same position in which they would have been had the policyholders' insurance company remained solvent.' *Hetzel v. Clarkin*, [244 Kan. at 706.] To prohibit an uninsured motorist insurer from recovering the difference between the limit of the insured's policy with an insolvent insurer and the damages for which the insured is liable when those damages exceed the policy limit is to put the insured in a better position than if his or her insurer had remained solvent. If the insurer were solvent, the insured would remain personally liable for any damages exceeding his or her liability policy. Under the blanket prohibition espoused by Harper and evidently endorsed by *Bartee*, this personal liability is erased as long as the insurer is insolvent." 18 Kan. App. 2d at 743.

The *Maston* court concluded that an uninsured motorist carrier may pursue a subrogation claim against the insured of an insolvent insurer when: "(1) the damages owed by the insured exceed the insured's coverage with the insolvent carrier; and (2) the uninsured motorist carrier seeks to subrogate the insured only for the amount

by which the damages exceed the insolvent carrier's coverage." 18 Kan. App. 2d at 744.

In our case, Midwest Drywall relies on the literal language of the holding of *Maston* and argues that, because Travelers' entire subrogation claim falls well within the policy limits of Midwest Drywall's coverage, the entire claim is barred. Travelers, on the other hand, persuasively argues that the rationale of *Maston* supports its position.

Because a "covered claim" must arise out of and fall within the coverage of the policy, Travelers argues that the Guaranty Act does not bar this portion of its subrogation claim. If Midwest Drywall's insurer had not become insolvent, Midwest Drywall would have been liable for any portion of the damages that were not covered under its policy with Reliance. According to Travelers, $142,360 in damages would not have been covered by the policy; thus, Midwest Drywall would have been liable for that amount had Reliance not become insolvent. Assuming the validity of this portion of Travelers' argument, the district court's decision places Midwest Drywall in a better position than it would have been had Reliance not become insolvent. It is consistent with *Maston* to allow Travelers to sue Midwest Drywall to recover that portion of the damages which Midwest Drywall's policy with Reliance would not have covered. This ruling is also consistent with the purpose of the Guaranty Act "to put . . . policyholders in the same position in which they would have been had the policyholders' insurance company remained solvent." *Hetzel*, 244 Kan. at 706.

Midwest Drywall cites a variety of different reasons for rejecting Travelers' position. First, Midwest Drywall points out that the Association has assumed the defense of Midwest Drywall without denying any claim based on the exclusion in question. According to Midwest Drywall, the issue of coverage is between Midwest Drywall and the Association and, as a third party, Travelers has no standing to challenge the Association's coverage decision.

Midwest Drywall also contends that requiring it to prove that it would have had coverage and that no exclusion would have operated to bar coverage imposes a burden greater than it would normally have in any other insurance dispute. Generally, the burden

is on the insured to prove that a loss falls within the scope of an insurance policy. *Brumley v. Lee*, 265 Kan. 810, 816, 963 P.2d 1224 (1998). However, the burden of proving that an exclusionary provision applies to preclude coverage falls upon the insurer. See *Speth v. State Farm Fire & Casualty Co.*, 272 Kan. 751, 753, 35 P.3d 860 (2001).

Both of these arguments ignore the fact that Midwest Drywall was attempting to use the Guaranty Act as a shield to protect itself from Travelers' subrogation claim. Since Midwest Drywall asserted the Guaranty Act's provisions as a defense and ordinarily is required to show that a loss falls within the scope of the policy, Midwest Drywall is required to show that Travelers' subrogation claim met the definition of "covered claim" under the Guaranty Act because it arose out of and fell within the coverage of the policy. See K.S.A. 40-2903(c).

Midwest Drywall also argues that requiring it to show that its claim would have been covered would be an exercise in mere speculation because its insolvent insurer, Reliance, could no longer offer a coverage opinion. Along those same lines, Midwest Drywall contends that if this court accepts Travelers' argument, such a decision would open the floodgates to subrogation claims that would ordinarily be barred by the Guaranty Act because any insurer subject to the subrogation bar will seek a second opinion from the appellate courts on coverage issues. Furthermore, requiring the Association to litigate coverage issues would be costly, and that cost would ultimately be borne by the public.

These types of policy considerations are more appropriately considered and decided by the legislature. The Kansas Guaranty Act, unlike other states' acts, does not specifically prohibit subrogation claims against tortfeasor insureds. Such a prohibition is only inferred from the Guaranty Act's statement of purpose. *Bartee*, 245 Kan. at 508-09. Thus, the plain language of the Act does not require Travelers' subrogation claim to be barred under the circumstances presented in this case. While Midwest Drywall is correct that the legislature vested claims responsibility with the Association and limited the right of subrogation when there was coverage, this does not mean that the Association is immune or exempt from coverage

disputes. If anything, placing the Association in the shoes of the insolvent insurer means that the Association will have coverage disputes. The Act leaves open the possibility of disputed claims and potential litigation as a risk the Association, like any insurer, bears.

Midwest Drywall also argues that if Travelers is allowed to bring its subrogation claim, Midwest Drywall will in turn submit any judgment amount to the Association for payment; therefore, Travelers will be receiving payment indirectly from the Association, a result prohibited by the Guaranty Act's bar against subrogation claims. This argument ignores the fact that Travelers can only bring a claim for the amount of damages *not* covered by Midwest Drywall's policy with Reliance. If the claim would not have been covered by that policy, it is by definition not a "covered claim" under the Act and the Association would have no liability. On the other hand, nothing in the Act requires Travelers to absorb the cost of a claims error or misjudgment by the Association if the Association did not deny coverage where the policy excluded the loss. Further, there is nothing in the Act which would prohibit the Association from seeking a declaratory judgment regarding a coverage question.

Finally, Midwest Drywall cites a list of cases from other jurisdictions which hold that an insurer may not directly subrogate a claim against a tortfeasor with an insolvent insurer. None of those cases, however, address the issue presented here regarding whether the insurer can litigate coverage questions. However, one out-of-state case which was not cited by the parties does address the issue before us. In *Window Coverings, Inc., v. Campbell*, 91 Or. App. 335, 755 P.2d 719 (1988), airplane owners filed suit against the members of a partnership, Airvest, which owned and operated an airport hangar that collapsed, damaging plaintiffs' airplanes. Airvest's insurer became insolvent; thus, the Oregon Insurance Guaranty Association (OIGA) assumed defense of the case. The trial court granted summary judgment in favor of the defendants on the basis of an Oregon statute, Or. Rev. Stat. § 734.695, which barred subrogation recoveries against the insured of an insolvent insurer.

On appeal, the plaintiffs argued that there were questions of fact about whether the defendants or their conduct came within the coverage of the insolvent insurer's policy. The defendants countered that both the insolvent insurer and, later, OIGA had acknowledged that the policy covered the defendants and the claims and that determination could not be challenged.

The Oregon Court of Appeals disagreed with the defendants' argument that the insolvent insurer's and OIGA's acceptance of the claims was dispositive of the coverage issue. The court stated, "Although the consensual construction the parties to a contract give it is highly relevant, [citation omitted] it is not conclusive, and a third party whose interests are affected by the meaning of a contract may challenge the parties' interpretation." 91 Or. App. at 340.

Next, the court considered the plaintiffs' argument that the claim must fall within the coverage of the policy before defendants can take advantage of the subrogation bar. The court found this argument to be "circular and somewhat self-defeating" given the statutory language involved. 91 Or. App. at 341. On one hand, the statutory scheme provided that OIGA must pay covered claims, except to subrogating insurers. On the other, the statute did not specifically limit an insured's liability to covered claims. Nonetheless, the court agreed that, in order to benefit from the statutory bar against subrogation claims, the defendants "must be the insureds of an insolvent insurer or *their conduct must come within the coverage of the insurer's policy.*" (Emphasis added.) 91 Or. App. at 341. The court then went on to discuss whether the defendants' alleged conduct came within a specific policy exclusion and found that it did not. 91 Or. App. at 341-42.

While the usefulness of the above case is limited because of the differences between the Oregon and Kansas statutory provisions, it does lend support to Travelers' argument that it should be allowed to litigate coverage issues, and the analysis is persuasive.

We conclude, under the facts of this case, that Travelers, as the plaintiff's insurer, may exercise rights of subrogation against Midwest Drywall for those amounts for which there was no coverage under Midwest Drywall's policy with Reliance. Subrogation in such circumstances is not prohibited by the Act and is consistent with

the purpose of the Act which is to place policyholders of insolvent insurers in the same position as the policyholder would have been had its insurance company remained solvent.

### Does the Exclusion Apply to Bar Coverage?

The remaining question is whether Travelers' argument that the "work product" policy exclusion would have barred coverage is correct. While Travelers made this argument before the district court in its motion for reconsideration, the basis for the district court's decision overruling that motion is unclear. The court simply stated it believed Midwest Drywall had correctly set out the law in its response. Looking to that document, Midwest Drywall had asserted several alternative bases for rejecting Travelers' motion for reconsideration. Midwest Drywall argued that Travelers should be precluded from raising new arguments not briefed during summary judgment; that Midwest Drywall should not be required to prove that the policy exclusions at issue would not apply to bar coverage; and that the policy contained exceptions to the exclusions so that, in fact, there was no bar to coverage. Thus, it is not clear from the record whether the district court rejected Travelers' argument because it found that Travelers should not be allowed to litigate the coverage issue or because it found that the policy exclusions did not apply.

Given the procedural history of the issue, and specifically given the policy was not part of the record of Midwest Drywall's motion for summary judgment, it appears the trial court's decision was based upon a determination that Travelers should not be allowed to litigate the coverage issue. As we have already held, that decision was erroneous. If the court's decision was based upon a determination that the policy exclusions applied, that decision was also erroneous.

The policy exclusions at issue read as follows:

"This insurance does not apply to: . . . '[p]roperty damage' to: . . . [T]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

"This insurance does not apply to: . . . '[p]roperty damage' to 'your work' arising out of it or any part of it. . . ."

In support of its argument, Travelers cites *Owings v. Gifford*, 237 Kan. 89, 697 P.2d 865 (1985), a case involving faulty work by a contractor/builder of residential construction, which discusses these types of insurance policy exclusions. The policy at issue in *Owings* excluded coverage for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." 237 Kan. at 91. The court held that the policy excluded coverage for property damage to the residence caused by the contractor's negligence in faulty construction. 237 Kan. at 93.

The *Owings* court explained that the purpose of a general liability policy is to provide coverage where the insured's work or product actively malfunctions, causing injury to a person or damage to another's property. 237 Kan. at 94. However, the policy excludes coverage for property damage due to the insured's own faulty work. For coverage of that risk, the builder may obtain a performance bond or purchase a guarantee of contractual performance. 237 Kan. at 93.

Travelers contends that $142,360 of its subrogation claim falls within the work product exclusion of the Reliance policy and thus would not have been a covered claim. If this contention is correct or Travelers is able to establish some other amount as within the exclusion, Travelers should be able to recover that amount from Midwest Drywall. However, Midwest Drywall contests this conclusion, arguing that under the facts the scope of the "work product" exclusion is not as far-reaching as Travelers claims. Midwest Drywall argues that once definitions and exceptions are applied under the facts, the exclusion would not apply or at most exclude only a few hundred dollars of the repairs rather than the $142,360 claimed by Travelers. These issues raise factual questions making summary judgment inappropriate. Under the facts of this case where discovery regarding the terms of the policy had not occurred and factual issues related thereto were not explored, it was an abuse of discretion to not grant the motion for reconsideration, and these issues should be considered on remand.

Travelers should be allowed to proceed with its subrogation claim against Midwest Drywall for those amounts not covered by the Reliance policy. Those amounts, if any, are not a "covered claim" under the Guaranty Act. Accordingly, the Guaranty Act's bar against subrogation claims does not apply.

Reversed and remanded.