IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 107,174

JESUS RODRIGUEZ, by and through His Next Friend and Natural Mother,
GRACIELA RODRIGUEZ,
*Appellant*,

v.

UNIFIED SCHOOL DISTRICT NO. 500, *et al.*,
*Defendants*,

and

MUTUAL OF OMAHA INSURANCE COMPANY,
*Appellee*.

SYLLABUS BY THE COURT

Under relevant statutes and the school district policies and administrative guidelines in the record on this appeal, private vehicle transportation to a school soccer match during which a student was injured was "covered travel," as that phrase is defined in the insurance policy at issue. A reasonably prudent insured would understand the travel to be both "authorized" and "subject to reimbursement."

Review of the judgment of the Court of Appeals in 49 Kan. App. 2d 262, 306 P.3d 327 (2013). Appeal from Wyandotte District Court; R. WAYNE LAMPSON, judge. Opinion filed June 12, 2015. Judgment of the Court of Appeals affirming the district court in part and reversing in part is reversed. Judgment of the district court is reversed and remanded.

*Stephen R. McAllister*, of counsel, of Thompson Ramsdell Qualseth & Warner, P.A., of Lawrence, argued the cause, *Henri J. Watson* and *Russell S. Dameron*, of Watson & Dameron, LLP, of Kansas City, Missouri, and were on the briefs for appellant.

1

*Robert J. Hoffman*, of Bryan Cave LLP, of Kansas City, Missouri, argued the cause, and *Lauren A. Horsman*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal addresses whether a Mutual of Omaha Insurance Company policy issued to the Kansas State High School Activities Association provided coverage for catastrophic personal injury suffered by 10th grader Jesus Rodriguez.

We hold that coverage exists. We therefore reverse contrary rulings by the district court judge and a panel of our Court of Appeals, and we remand the case to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The accident that injured Rodriguez occurred on August 29, 2006, while he was traveling to his first match of the Sumner Academy soccer season. Rodriguez was riding in the bed of a pickup truck driven by fellow student and teammate Mike Hitze when the pickup collided with another car. Rodriguez was thrown from the pickup and sustained the injury that now requires him to have round-the-clock care.

Rodriguez' mother, Graciela, initially filed this lawsuit on his behalf against the school district, Hitze, and the driver of the car that had collided with Hitze's truck.

During the course of the lawsuit, plaintiff learned that the Association, which administers various extracurricular activities in the state, had purchased a Mutual of Omaha policy to cover injuries sustained by participants during events the Association

2

sanctioned, as well as during certain types of travel to and from such events. The insurance policy covered

> "[s]tudents participating in interscholastic competition or activities under the jurisdiction of the KSHSAA including school-supervised practice, try-outs, pre and post game-related activities including award banquets and covered travel as defined under the policy."

There is no dispute that the soccer match was a competition that fit this description. The policy defined "covered travel" as

> "team or individual travel, for purposes of representing the Participating School, that is to or from the location of a Covered Event and is *authorized* by the Insured Person's Participating School, provided the travel *is paid for or subject to reimbursement* by the Participating School. Covered Travel to a Covered Event will commence upon embarkation from an authorized departure point and terminate upon arrival at the location of the Covered Event." (Emphasis added.)

Rodriguez filed a claim, and Mutual of Omaha denied it, reasoning that the travel during which Rodriguez was injured did not qualify as covered under the policy. According to Mutual of Omaha, the school had indicated no request for reimbursement for the travel had been made; moreover, the travel was not "subject to reimbursement" because the school also had indicated that it had "been unable to locate any requests for reimbursement, or payment of, expenses incurred by a parent or student using a private vehicle to transport students to a sporting event." Mutual of Omaha asserted that all expenditures of the school system must be authorized by law, and there was no statutory authorization for a school to pay a private individual for use of a private car to transport a student in Rodriguez' circumstances.

After the denial of coverage, Mutual of Omaha was added as a defendant in this lawsuit. A bench trial limited to the insurance coverage issue followed.

Rodriguez' mother testified that Rodriguez' father had signed a permission form covering travel options for members of the soccer team. The form granted permission for Rodriguez to, among other things, "[r]ide with other players from school to practice, home meets, or to meet the bus for away meets" and to "[r]ide to team events with other players."

Israel Ocanas, one of the other team members who rode with Hitze and Rodriguez on the day of the accident, testified that he was unaware whether the school had provided a bus for team members. He said that no one had directed him to travel by bus. According to Ocanas, it was "normal . . . to just catch a ride with whoever was heading that way in a car." Ocanas testified that, when the campus officer let Hitze's pickup exit the school parking lot, Rodriguez was sitting in the pickup bed. The group then waited across from the school for other team members to arrive. Eventually a total of three, including Rodriguez, rode in the bed of the pickup.

Much of the testimony at trial focused on the school district's policies and administrative guidelines. The administrative guidelines mirror the numbering system of the policies but are amended with an "-A." As one of the school district's administrators would testify, the guidelines are not "policy per se. But they're . . . guidelines that administrators are expected to follow. They help them in making their decisions in order to implement policy correctly."

The clerk for the Board of Education, Susan Westfahl, testified about a school district administrative guideline, 3.5.5.0.0-A, which was titled "Pupil Transportation." The guideline included the following passage:

".3.0    Field Trips, Curricular Activities, Extracurricular Activities

".3.1                Field Trips and Curricular Activities

                    "Arrangements for activity transportation shall be made
            by the Building Administrator using the Field Trip Request
            procedure.

                    "When district equipment or drivers are unavailable or
            when it is economically advantageous to use other means of
            activity transportation, arrangements for hired or non- district-
            owned activity transportation shall be made by the building
            administrator.

. . . .

".3.1.4                Private Vehicle

                    "Use of private automobiles for field trips and activity
                    transportation shall not be authorized except in such
                    instances where drivers are fully responsible adults (over
                    21 years of age). Authorized drivers shall verify
                    insurance coverage in accordance with established
                    Kansas insurance minimums to the building principal or
                    his designated representative."

No copy of the guideline in the record on appeal includes a subsection covering
extracurricular activities such as soccer matches. Westfahl also testified that, in the 10
years she had worked for the Board, she could not recall an instance in which the Board
had approved reimbursement for a student who had transported another student to a
school activity.

5

Testimony of Tom Petz, executive director of human resource services for the school district, was submitted during the bench trial by way of transcribed deposition and exhibits. The exhibits to Petz' deposition included a school district policy, 3.5.5.0.0, titled "Pupil Transportation." It stated in part:

> "Responsibility for general administration of pupil transportation programs shall be subject to the direction of the Superintendent of Schools with a delegation of responsibility through the Assistant Superintendent for Business Affairs to the Director of Pupil Transportation Services.

".1.0    Equipment

> "Depending upon the demands of services involved, transportation shall be provided with equipment which may be:

- Owned by the school district
- Leased by the school district and operated by the school district itself
- Contracted with a contract carrier.

".1.1        Use of Privately-Owned Cars

".1.1.1            Privately-owned cars shall not be employed by Unified School District #500 of Kansas City in the transportation of pupils to and from schools except as outlined in Policy 3.5.5.2.3 et seq. [dealing with exceptional students].

".1.1.2            Privately-owned cars driven to and from school shall be subject to such rules and regulations as established by the Board of Education for the control of traffic on or around school grounds as provided by KSA 72-9101.

6

".2.0    Service Areas

".2.1            High Schools and Middle School

               "Transportation for high school and middle school pupils will be
        provided for those pupils living one and one-half (1-1/2) miles or more
        from the school by the nearest commonly traveled route. Bus stops and
        routes shall be so arranged as to be of maximum convenience and safety
        and shall be so located that no pupil eligible to be transported shall be
        required to walk more than .5 (1/2) miles to the nearest stop.

".2.1.1              High School Magnet Programs

               "A routing plan shall be established to provide transportation for
        students enrolled in the high school magnet program.

. . . .

".3.0    Field Trips, Curricular Activities, Extracurricular Activities

               "When appropriate and feasible in the regular course of instruction, bus
        transportation may be furnished for field trips, programs and the general instructional
        program. Transportation shall be furnished to the extent that such transportation can be
        provided without impairment of the general transportation program and within the
        limitation of funds budgeted for such transportation.

".3.1            Field Trips and Curricular Activities

               "Any transportation for field trips and curricular activities shall be
        provided only upon the specific approval of the Superintendent of Schools or his
        designated agent. Requests for such transportation must be made at such time
        and in such form as may be required by the Superintendent.

7

".3.2           Extracurricular Activities and School Associated Groups

"Transportation shall be provided for various music, athletic and other school associated groups. Arrangements for transportation shall follow the administrative guideline for Pupil Transportation 3.5.5.0.0.-A.

".4.0    Special Activity Transportation

"Special activity transportation shall be provided for pupils as identified in Board Policy 3.5.5.2.1 and 3.5.5.2.1.1 enrolled at secondary (high schools and middle schools) attendance centers.

".4.1           After-School Activities

"Administration guidelines shall provide for service to permit participation in activities conducted in a period of not to exceed two and one-half (2 1/2) hours after the close of the regular school day and at such other times as may be necessary to permit normal participation.

".4.1.1           No special activity transportation shall be provided for spectators, guests, parents or other non-participants in the specific activity involved."

The exhibits to Petz' deposition also included administrative guideline 3.5.5.0.0-A about which Westfahl had testified. The administrative guideline's provision for insurance coverage included the following language:

".3.0    Field Trips, Curricular Activities, Extracurricular Activities (Continued)

".3.2           Insurance Coverage

8

".3.2.1          The District Fleet Policy covering bodily injury and personal injury protection extends coverage to students, employees and sponsors involved in authorized activity transportation. Drivers/owners of private automobiles authorized for field trips and activity transportation are covered by the District Fleet Policy.

".3.2.2          Students being transported to events sanctioned by the Kansas State High School Activities Association are eligible for catastrophic coverage.

".3.3          Insurance Coverage—Non-District Owned Vehicles

".3.3.1          The list of approved carriers shall include only contractors who meet or exceed district insurance minimums and, in addition, name District #500 as 'additional insured' while transporting District #500 students, employees and non-employees.

".3.3.2          Schools renting or leasing vehicles shall take 'additional coverage.'

".3.3.2.1          The additional package of collision, comprehensive, and liability coverage insurance reduces the schools' responsibility for the deductible. Schools shall purchase the maximum coverage available for collision and comprehensive insurance.

".3.3.2.2          The District is exempt as a governmental agency and is covered by medical insurance under the Fleet Policy, therefore, it is not necessary to secure Personal Injury Protection (P.I.P[.]) as an additional coverage.

9

".3.3.3                    Private Auto

".3.3.3.2                           Verify that liability insurance coverage is in effect
                                   covering the owners and driver of the vehicle with state
                                   minimum liability requirements of $25,000.00 per
                                   individual, $50,000.00 per accident, and $10,000.00
                                   property damage."

The administrative guidelines also contained one passage specific to Sumner Academy of
Arts and Science:

".4.5.1                            In addition to transportation to and from school as outlined in
                                   Policy 3.5.5.2.1, special activity and service buses will be
                                   operated to serve all pupils who are involved in various
                                   extracurricular activities after the close of the school day. Special
                                   transportation schedules are made as follows:

".4.5.1.1                          One departure time from the school is to be approximately one
                                   (1) hour after the close of the regular school day.

".4.5.1.2                          A second departure time is to be at approximately two and one-
                                   half (2-1/2) hours following the close of the school day."

Petz was the administrator who differentiated between numbered district policies
and numbered administrative guidelines and explained the role of the administrative
guidelines in an administrator's decision-making process.

"[A]dministrators have—always have discretion in terms of . . . implementing
or . . . administering their building based on . . . the individual circumstances
that may or may not come up.

        . . . .

10

"You cannot totally tie the hands of an administrator and expect that they have to run their building by any one set of guidelines. There's no way that you can write a set of guidelines that are going to apply to every situation that may or may not come up in a school building.

"If you've ever worked in a school building or if you've ever been an administrator in a school building, you would know that there are a myriad of different things that come up, and trying to have one set of guidelines that are going to apply to every particular instance that arises would be—you would have a book so voluminous that, you know, it wouldn't fit in this room. And then something would happen, and you wouldn't be able to find it in there anyway . . . . because there's always a variety of things. So these are general administrative guidelines to assist them in their thought process. But in most cases, you know, they're going to follow this process and adhere to—it's more or less that these are to assist them in interpreting and administering board policy correctly."

Petz testified that he was unaware of any district policy regarding reimbursement of costs for transportation of students other than special education students. However, he said that it was "not necessarily true" that other reimbursement for transportation would not be permitted. "[D]epending upon the circumstances of the event," he said, "building principals could make determinations that . . . other alternative forms of transportation are appropriate. . . . There's not anything that particularly says in policy that they can do that. But policy does not preclude them from making that judgment." Petz said that the policy on reimbursement of costs for special education students' transportation would not have applied to the activity transportation provided Rodriguez by Hitze. To his knowledge, there was "no written policy that specifically says that it's allowed, but there's not a specific policy that says it's not allowed."

Petz also was asked specifically about the transportation provided by the school for the soccer game on August 29, 2006, and whether the school had "authorized"

Rodriguez to ride with Hitze. Petz said that the administrative guideline numbered 3.5.5.3.1.4-A, which required the presence of a "fully responsible adult[]" when students traveled by private vehicle, would apply only when the school arranged for private transportation to a school activity. He said that it did not apply to Rodriguez' travel in Hitze's pickup truck because "[t]he official mode of transportation that the district had arranged for [the soccer game] was by bus." Students such as Rodriguez were not precluded from arranging other forms of transportation on their own, as long as the students' parents had signed a permission form allowing those forms of transportation. "The schools permitted the parents to authorize outside travel," he said. Petz said that the school district could not support someone riding in the back of a pickup truck, but Rodriguez was still under the "jurisdiction of the school" while he did so because he was going to the soccer match.

> "Students have the prerogative to utilize private vehicles to transport themselves to school-sponsored activities. The school district in most cases will arrange school district transportation and have that available to them, but as I mentioned earlier, there are instances where students and families may choose to not avail themselves to that opportunity that they have. And—
>
> . . . .
>
> "And that's allowed. It's not like if they don't get on the school bus, when they get to the game, they don't get to play. You know, so they are allowed to utilize their own transportation."

Petz also testified that any reimbursement that had been requested would have come from the building activity fund and that it would be up to the principal whether to pay reimbursement.

12

"To my knowledge, there's not anything in policy that says you are to pay mileage to students or that you're not to or you can't. It's left to the discretion of the building administrator as the manager of that budget as to what he or she determines are appropriate costs as to pay out of those funds.

. . . .

"I testified that there's nothing in policy that would prevent a principal from making a determination that mileage was a justifiable expense out of his or her activity fund. So there's nothing that says they have to. There's nothing that says they can't. It's basically a discretionary decision of the administrator as the budget manager of that fund."

Petz testified that, in his opinion, any request for reimbursement that Hitze might file would be "subject to reimbursement" under the Mutual of Omaha insurance policy.

The school district's attorney, Gregory Goheen, testified live at the bench trial. Goheen said that he had provided Mutual of Omaha with certain information about the school district's policies and procedures relating to reimbursement of travel expenses, the statute he believed to provide the basis for travel reimbursement, and information on whether there were records of any student previously submitting a reimbursement request for expenses of driving to or from athletic events. According to Goheen, the school district could not find any record of a student filing a claim to be reimbursed for providing transportation for another student. He described a letter he sent to counsel for Mutual of Omaha that states it encloses a school district policy labeled 4.1.13.3.1. The enclosed policy included the following language:

".3.1    Travel Mode and Rate

"Persons authorized to travel at Board expenses should adhere to administrative guidelines.

. . . .

".3.1.2    Travel by personal automobile will be reimbursed at the official mileage rate established by the State of Kansas when this mode of travel is approved by the Superintendent or appropriate assistant superintendent.

. . . .

".3.2    Expense Reimbursement

"Expenses approved for reimbursement are subject to administrative guidelines and the following limits:

. . . .

".3.2.5    . . . mileage at the official mileage rate established by the State of Kansas."

Goheen also testified that Mutual of Omaha had asked him whether the school district would have paid a claim for mileage had a request for mileage reimbursement actually been made by Hitze. Goheen said he declined to answer Mutual of Omaha's question because it was "a hypothetical and we hadn't received the claim."

At the conclusion of the bench trial, the district judge ruled that Rodriguez' travel in Hitze's truck was neither "authorized" by the school district nor "subject to reimbursement," the two requirements for "covered travel" under the definition in the

14

Mutual of Omaha policy. The judge based his decision on his belief that the school was prohibited by state law and district policies from authorizing travel by private vehicle when no adult was present. And, in his view, the travel would have qualified as subject to reimbursement only if the driver had a contract with the school district to pay for gasoline; there was no evidence that Hitze had such a contract. The district judge therefore held that Mutual of Omaha should be dismissed as a defendant in the case.

Rodriguez appealed to the Court of Appeals.

The Court of Appeals panel began its analysis of whether the accident occurred during "covered travel" by holding that there was no ambiguity in the insurance policy's language requiring the travel to be "'authorized'" and "'subject to reimbursement.'" *Rodriguez v. U.S.D. No. 500*, 49 Kan. App. 2d 262, 265, 306 P.3d 327 (2013). It therefore "attribute[d] ordinary everyday meanings to the ordinary words used in this clause dealing with covered travel." 49 Kan. App. 2d at 265.

The panel held that Sumner Academy's system of parental permission forms

"created an informal method of transporting team members to soccer games by permitting teammates to ride with each other instead of riding on the school bus—the 'official' mode of transportation. Employing permission slips from parents gave ample notice to all participants that the district would permit this form of travel. We do not speculate why this was done because the record is unclear on that point. . . .

"These words and deeds compel us to conclude that the school permitted this transportation—this trip was not some impromptu act of two young men trying to break the rules as an act of rebellion. This system of informal transportation of students was created and sanctioned by the school. In our view, this was authorized travel as contemplated by the insurance policy." 49 Kan. App. 2d at 267.

15

The panel then turned to the question of whether the travel was "subject to reimbursement." It held that travel could not qualify as subject to reimbursement if a claim could not actually be paid. Quoting from the administrative guideline discussed by Westfahl during the bench trial, which it mislabeled a district "policy," the panel said that a person older than 21 must have been present and proof of insurance coverage must have been supplied to enable payment of any claim by Hitze. 49 Kan. App. 2d at 272-73. Thus, despite the panel's disagreement with the district judge on whether Sumner Academy authorized the travel, it held that the travel involved in this case did not qualify as subject to reimbursement, and thus there was no coverage under the Mutual of Omaha policy. 49 Kan. App. 2d at 275.

Rodriguez filed a petition for review to this court, asking us to reverse the panel's holding that the travel was not subject to reimbursement. He attached a document labeled "Plaintiff's Exhibit D" but referred to as "Appendix, Demonstrative Exhibit 1," apparently to illustrate the difference between a school policy and a school administrative guideline. We note that this comparison document appears nowhere else in the record on appeal in this format and that the language in what is represented as Policy 3.5.5.3.2.1 is not included in the copy of the policy that was marked during Petz' deposition. We therefore will not rely on this portion of the appendix. See Supreme Court Rule 8.03(h)(2) (2014 Kan. Ct. R. Annot. 77) (case heard on petition for review to be considered on basis of record previously filed with Court of Appeals); see also Supreme Court Rule 8.03(a)(4)(F) (2014 Kan. Ct. R. Annot. 78) (appendix to contain copy of Court of Appeals opinion, other "opinions, findings of fact, conclusions of law, orders, judgments, or decrees issued by the district court or administrative agency, if relevant to the issues presented for review"); *cf.* Supreme Court Rule 6.02(b) (2014 Kan. Ct. R. Annot. 40) (optional appendix to appellant's brief to contain limited extracts from record on appeal; appendix not substitute for record itself); Supreme Court Rule 6.03(b) (2014 Kan. Ct. R.

Annot. 47) (optional appendix to appellee's brief subject to same restrictions as optional appendix to appellant's brief).

Mutual of Omaha filed no cross-petition of the panel's holding that the travel was authorized, but its counsel asserted at oral argument before this court that we are permitted to review that issue as well. See Supreme Court Rule 8.03(h)(1) (2014 Kan. Ct. R. Annot. 77) (permitting Supreme Court to revisit issue preserved and considered by Court of Appeals in civil case). We therefore address both aspects of the Mutual of Omaha policy's definition of "covered travel" in our discussion below.

DISCUSSION

Interpretation of an insurance policy raises "a question of law over which appellate courts have unlimited review." *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70 (2014). "'As a general rule, the construction and effect of a contract of insurance is a matter of law to be determined by the court. If the facts are admitted, then it is for the court to decide whether they come within the terms of the policy.'" *Harris v. Richards*, 254 Kan. 549, 552, 867 P.2d 325 (1994) (quoting *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, Syl. ¶ 1, 660 P.2d 1374 [1983]). We assign language in an insurance policy the meaning a reasonably prudent insured would understand it to have. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003).

On this appeal, no significant facts are in issue. The authenticity of the signature of Rodriguez' father on the travel permission form is unchallenged. The circumstances of Rodriguez' accident and injury are, for purposes of resolving the coverage controversy, undisputed. The fact that Hitze had never submitted a request for reimbursement to Sumner Academy or to the school district by the time of the bench trial is established beyond question. Likewise, the content of potentially controlling law and documents—

the insurance policy, statutes, district policies, or administrative guidelines—is set and merely awaits interpretation or construction.

We therefore face two pure questions of law subject to de novo review:  Was Rodriguez' travel authorized by Sumner Academy? And was the travel subject to reimbursement by Sumner Academy?

*Authorization*

We agree with the Court of Appeals panel that Sumner Academy's system of obtaining parental consent and then allowing the type of travel at issue here leads inexorably to the legal conclusion that Rodriguez' travel in Hitze's pickup truck was "authorized" by the school, as that unambiguous word is commonly understood. See Webster's Third New Int'l Dictionary 146 (1993) ("authorize" means "to endorse, empower, justify, or permit by or as if by some recognized or proper authority).

As the panel explained, the district judge misinterpreted and misapplied both a district administrative guideline, mischaracterized by the panel as a "policy," and Kansas statutes.

The district judge relied in part on administrative guideline 3.5.5.3.1.4-A, which requires the presence of an adult and verification of insurance if a private vehicle is used. But Petz emphasized more than once that this guideline, to the extent any guideline had binding effect, was not applicable to travel such as that at issue here. Rather, it applied only when the school *arranged* a specific mode of travel, such as the bus he believed to have been provided for the August 29, 2006, soccer match. Petz repeatedly made clear that Rodriguez' travel with Hitze was *not arranged or supervised* by the school. It was

18

not the official transportation subject to district requirements that an adult be present and insurance coverage verified. The bus was.

We also note that the administrative guideline falls under the subheading specific to "Field Trips and Curricular Activities," not extracurricular activities such as soccer matches.

The statutes on which the district judge relied, K.S.A. 72-8305 and K.S.A. 72-8301(c), also were not actually helpful to his analysis of whether Rodriguez' travel with Hitze was "authorized."

K.S.A. 72-8305 states that a board of education of any school district may provide and furnish transportation for students involved in extracurricular school activities:

> "The board of education of any school district . . . which school district . . . is: . . . (c) engaged in any extracurricular school activity, may provide and furnish transportation for students . . . . The school district . . . may pay mileage for those school buses contracted, leased or hired for such purposes, and may adopt rules and regulations governing the use and operation of such school buses. All students so transported shall be under school control and discipline and in every case shall be accompanied by a suitable adult person."

K.S.A. 72-8301(c) defines the phrase "'provide or furnish transportation'" to include a school district's right to reimburse persons who provide transportation to students in private vehicles:

> "The words 'provide or furnish transportation' in addition to their ordinary meaning shall mean and include the right of a school district to: (1) Purchase, operate and maintain school buses and other motor vehicles; (2) contract, lease or hire school buses and other motor vehicles for the transportation of pupils, students and school personnel; (3)

purchase, operate and maintain buses other than school buses for the transportation of pupils, students or school personnel to or from school-related functions or activities; (4) contract, lease or hire buses other than school buses for the transportation of pupils, students and school personnel if the buses are owned and operated by a public common carrier of passengers under a certificate of convenience and necessity granted by the state corporation commission or the interstate commerce commission and are operating within the authority granted to the public common carrier; and (5) reimburse persons who furnish transportation to pupils, students or school personnel in privately owned motor vehicles."

The district judge combined the multipart definition from K.S.A. 72-8301(c) with the plainly bus-specific language in the last sentence of K.S.A. 72-8305 to read in a requirement, similar to that in the administrative guideline above, for an adult presence. As the panel recognized, this was error, "too much of a stretch." *Rodriguez*, 49 Kan. App. 2d at 269.

Petz' deposition testimony, admitted at the bench trial, made clear that Rodriguez' travel with Hitze, although not arranged for or supervised by Sumner Academy, was nevertheless authorized by it. Nothing in the administrative guideline 3.5.5.3.1-A or in K.S.A. 72-8305 or K.S.A. 72-8301(c) runs contrary to Sumner Academy's system of allowing such travel once parents agreed to it.

*Subject to Reimbursement*

Our agreement with the Court of Appeals panel ends with the authorization issue. Unlike the panel, we also conclude that Hitze's expense in transporting Rodriguez to the soccer match qualified as "subject to reimbursement" under the Mutual of Omaha policy.

20

It was the responsibility of Mutual of Omaha, as it is with any insurance company, to draft the coverage language it deemed necessary to define and contain its risk. See *Marshall*, 276 Kan. at 112 (insurer assumes duty to define limitations to insured's coverage clearly, explicitly). In this case, it did not restrict the definition of covered travel to that actually paid for or even likely to be paid for. Rather, it expressly included travel merely "subject to" being paid for. Neither party argues that "subject to reimbursement" is an ambiguous phrase, and we agree that it is not. Even if we did regard the phrase as ambiguous, we would be required to interpret it in the insured's favor. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70 (2014). In our view, a reasonably prudent insured would understand the phrase to include travel that *could* be reimbursed and not limit its application to travel that *was likely or would* be or was *required* to be reimbursed.

State statutes do not compel a contrary conclusion. K.S.A. 72-8305 permits the board of education of a school district to provide and furnish transportation for extracurricular activities. As the Court of Appeals recognized, K.S.A. 72-8301(c) contemplates the possibility that a school district reimburse persons who provide transportation to students in private vehicles. And K.S.A. 72-8208a addresses the creation and disbursement, as well as the accounting necessary, for such funds:

> "(a) The board of education of any school district may authorize, by separate resolutions, the establishment of school activity funds from which to make needed expenditures for the payment of expenses attributable to activities in which pupils of the district may participate directly or indirectly. Every such resolution shall specify the general purpose for which the fund is to be established and shall authorize an employee of the school district to administer the fund.

> "(b) The employee authorized to administer any school activity fund established by any resolution provided for in this section shall keep a record of all receipts and

21

expenditures from the fund, and shall, from time to time, and at the end of each school year, prepare a statement for the board of education showing all receipts, expenditures, and the balance in the fund. The fund shall be kept separate from all other funds and be used only for authorized expenditures, and itemized receipts shall be taken for each expenditure.

"(c) All moneys received from the sale of admissions to activities which the school district sponsors shall be credited to school activity funds in accordance with policies and procedures adopted by the board of education. Such moneys shall not be considered to be moneys of the school district for the purposes of K.S.A. 72-8202d, and amendments thereto.

"(d) The provisions of K.S.A. 12-105b, and amendments thereto, shall not apply to claims against any school activity fund established by any resolution provided for in this section.

"(e) As used in this section, the term 'activities' means activities, events, and competitions in such fields as athletics, music, forensics, and dramatics, and other interschool or intraschool extracurricular activities in which pupils may participate directly or indirectly."

This statutory scheme appears to be consistent with Petz' testimony, which indicated that a district principal would have discretion to choose whether to reimburse one student for transporting another student to a soccer match, tapping student activity funds for that purpose.

We also see nothing in the school policies or administrative guidelines that would prohibit reimbursement of Hitze if he had chosen to seek it. As already discussed, Petz fully reviewed the distinction between school policies and administrative guidelines. He also made clear that neither the policies nor the guidelines prohibited reimbursement in the situation before us. We have carefully reviewed the language of all of the policies and

22

administrative guidelines in the record on appeal and agree with his assessment. Most of the policies and guidelines contained are irrelevant to transportation for extracurricular activities. They instead govern daily travel to and from school, transportation of special education students, field trips, and curricular activities. They are silent about a prohibition of reimbursement in the situation before us. Any contrary interpretation by the parties, their counsel, the district judge, or the Court of Appeals is simply incorrect, adding material and meaning to these provisions that does not exist.

As we close, we note that we need not go as far as we understood Rodriguez' counsel to urge us to go at oral argument: We do not reach the further question of whether the school district could adopt a policy or administrative guideline more restrictive of reimbursement for student travel in private vehicles than the current statutory scheme allows. We also do not decide whether a school district could choose to ignore such a policy or guideline in a specific case. See *Mallon v. City of Emporia*, 11 Kan. App. 2d 494, 498, 726 P.2d 1354 (1986). These are interesting questions, but they are not before us. The fact is that, according to the parties' evidence here, U.S.D. No. 500 had not adopted such a policy or guideline at the time Rodriguez was injured.

CONCLUSION

The travel during which Rodriguez was injured was "authorized" and "subject to reimbursement," and thus there is coverage under the Mutual of Omaha policy language. The decision of the Court of Appeals is reversed. The judgment of dismissal of defendant Mutual of Omaha by the district judge is reversed, and the case is remanded to the district court for further proceedings.

23

Nuss, C.J., not participating.

Michael J. Malone, Senior Judge, assigned.[1]

* * *

Johnson, J., dissenting: I have no fuss with the majority's determination that the mode of transportation to the soccer game—in the uncovered bed of a privately owned pickup truck driven by a teenaged teammate—was "authorized by the Insured Person's Participating School" within the meaning of the subject insurance policy, notwithstanding the nightmarish stupidity of that authorization. Where I part company with the majority is in its determination that such "travel [was] paid for or subject to reimbursement by the Participating School," as required by the clear language of the Mutual of Omaha policy. Specifically, if the school has no obligation to pay for the student's travel or no obligation to reimburse the student for his or her out-of-pocket travel expenses, then the student has no right to be reimbursed and the subject to reimbursement proviso has not been met.

I believe the majority made its decision easier to reach by placing the burden on Mutual of Omaha. But it was not Mutual of Omaha's obligation to prove that Jesus Rodriguez was *not covered* by the policy issued to the Kansas State High School Activities Association (Association), as will be discussed below. Before proceeding, however, I would note that this case presents a somewhat unique circumstance in that the Association contracted with Mutual of Omaha for the insurance policy, but the covered entities are the participating schools and the potential claimants are students at those

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 107,174 vice Justice Nuss under the authority vested in the Supreme Court by K.S.A. 20-2616.

schools. Nevertheless, I will occasionally refer to Mutual of Omaha as the "insurer" and Rodriguez as the "insured."

Further, in allocating burdens in an insurance policy dispute, one first needs to understand if the question presented involves: (1) whether the particular claim or claimant is covered by the policy ("coverage"); or (2) whether a policy exclusionary clause exempts or precludes an otherwise covered claim or claimant ("exclusion"). For example, consider that a policyholder submits a homeowners' policy claim under the personal liability portion of the policy to pay for a neighbor's bodily injury incurred when the policyholder's 19-year-old, still-living-at-home son hit the neighbor in anger. A coverage question would be whether the policy language extended the policy's liability protection to cover the acts of an adult son who was still living in the household, *i.e.*, whether the son was an insured person. If so, an exclusion question would be whether the exclusionary clause prohibiting coverage for intentional torts would apply to permit a denial of the otherwise covered claim.

Applying that distinction to this case, one can see that we are dealing with a coverage question, *i.e.*, whether Rodriguez was an insured person. Mutual of Omaha is not asserting that Rodriguez would have been a covered person but for an exclusionary clause. To the contrary, Mutual of Omaha is simply asserting that Rodriguez was not engaging in an insured activity at the time he was injured, *i.e.*, was not covered by the policy.

The coverage versus exclusion distinction is important because it determines who has the burden of proof. The burden allocation has been described as follows:

> "Where, as here, an insured files suit against its insurer seeking coverage under a
> policy of insurance, the insured has the 'burden of proving he or she falls within the

25

coverage provisions' of the policy. *Brumley v. Lee*, 265 Kan. 810, 963 P.2d 1224, 1232 (Kan. 1998). More specifically, 'the insured has the burden of proof to establish the nature and extent of any loss and that the loss claimed was caused by one of the perils insured against ("covered") by the policy.' *Kansas Farm Bureau Ins. Co. v. Reynolds*, 16 Kan. App. 2d 326, 823 P.2d 216, 218 (Kan. App. 1991) (internal quotation marks omitted). Assuming the insured can satisfy this burden, the insurer then has the burden of proving that any exclusionary clauses within the policy apply to preclude coverage. *Exploration Place, Inc. v. Midwest Drywall Co.*, 277 Kan. 898, 89 P.3d 536, 541 (Kan. 2004)." *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1008 (10th Cir. 2006).

Accordingly, the initial burden was on Rodriguez to establish that he was covered by the Association's policy through Mutual of Omaha at the time he was injured. The insurance policy defined the persons covered by the policy as "[s]tudents participating in interscholastic competition or activities under the jurisdiction of the [Association] including . . . covered travel as defined under the policy." Rodriguez was not yet participating or competing when he was injured, so he could only get within the class of insureds by proving that he was engaged in "covered travel." As the majority notes, the policy definition of "covered travel" not only requires that the mode of travel be authorized by the school, but also that the travel must be "paid for or subject to reimbursement by the Participating School." I see no proof in the record that Rodriguez' mode of transportation to the soccer game was paid for or subject to reimbursement by Sumner Academy, *i.e.*, no proof that he "falls within the coverage provisions" of the policy. See *Brumley v. Lee*, 265 Kan. 810, 823, 963 P.2d 1224 (1998) (reciting general rule that insured has burden of proving coverage).

The owner of the pickup in which Rodriguez was riding to the soccer game did not seek payment from Sumner Academy for his travel expenses, and Sumner Academy did not pay for those travel expenses. Apparently, no student in a similar situation has ever

26

sought payment from Sumner Academy for personal vehicle travel expenses. A school administrator declined to answer the question of whether the school would have paid the travel expenses, if a claim for reimbursement had been made. But the majority appears to be swayed by testimony, together with its independent assessment, that nothing in the school policies or administrative guidelines would have *prohibited* Sumner Academy from gratuitously paying the pickup owner's travel expenses from an activity fund, if a claim had been made. In my view, the possibility that the school might make a gift to a student equal to the expenses of private travel to a sporting event at some time in the future when the building administrator was feeling particularly charitable and the activity fund was flush with cash does not make Rodriguez' mode of transportation "covered travel" under the language of the insurance policy.

Turning to a construction of the insurance policy language, I note that a court should review the policy as a whole and endeavor to ascertain the intent of the parties from the language used, taking into account the parties' situation, the nature of the subject matter of the policy, and the purpose to be accomplished. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70 (2014). Moreover, as the majority points out, "[w]e assign language in an insurance policy the meaning a reasonably prudent insured would understand it to have. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003)." Slip op. at 17. Particularly pertinent here is the admonition that "[a]ll pertinent provisions of an insurance policy must be considered together, rather than in isolation, and given effect." *Lee*, 265 Kan. 810, Syl. ¶ 3. Accordingly, we should be construing the entire proviso—"the travel [was] paid for or subject to reimbursement by [Sumner Academy]"—in the context of the entire policy, rather than isolating the words, "subject to reimbursement."

When read together—paid for or subject to reimbursement by the school—a reasonably prudent insured would have to understand that the policy language is referring

27

to travel expenses for which the school is *obligated* to pay and for which the student has a *right* to reimbursement. In statutory construction, we sometimes apply the principle of *noscitur a sociis* (it is known from its associates). In that vein, "subject to reimbursement by the Participating School" should refer to an expense that would be in the same class of expenditures that would be "paid for . . . by the Participating School." And reasonable people would not understand that class of expenditures to include gratuitous, random payments for personal travel expenses for which the school was not responsible. After all, schools are taxpayer-funded entities. Likewise, one would expect travel expenses to be an operating expense, rather than be paid from an activity fund.

Moreover, reimbursement connotes an indemnification of expenses that the student expended on behalf of or for the benefit of the school. See Black's Law Dictionary 1476 (10th ed. 2014) (defining "reimbursement" as "1. Repayment. 2. Indemnification."). And among the definitions of "subject to" are "liable" and "answerable for," further suggesting that the reimbursement is not a discretionary act. See Black's Law Dictionary 1425 (6th ed. 1990). In other words, reasonably prudent people would expect to be reimbursed when they pay expenses rightfully charged to another person or entity, but they generally do not expect to be gratuitously paid for expenses that are incurred for their own benefit.

Further, one must presume that the Association purchased the insurance policy for the benefit of its member schools and intended for covered travel to be that which benefitted the school. In that context, one could also presume that the insurer would want to limit its travel exposure to those circumstances over which the school was exercising some oversight, which would occur if the coverage were limited to students who were travelling on a school-provided or school-funded mode of transportation.

Finally, a reasonably prudent insured would not expect that Sumner Academy would be paying for more than one mode of transportation. Here, the school paid for a bus to carry Rodriguez to the soccer game. Surely, he could not have reasonably expected that the insurance policy language would be interpreted to mean that he could reject the bus ride in favor of another mode of transportation, *e.g.*, a rented stretch limousine, and that the expense of his chosen alternate travel would be "subject to reimbursement by the Participating School." If such were the case, one would expect a lot of lonely bus drivers.

Notwithstanding the egregious injuries suffered by the Rodriguez in this case, it is nevertheless incumbent on this court to construe the insurance policy in a manner to give effect to the parties' intent. In that regard, I submit that the reason Sumner Academy had never before had a student request reimbursement for travel expenses under this scenario is that, as reasonably prudent persons, they knew that they were not entitled to be reimbursed. I would find that Rodriguez was not an insured covered by the Mutual of Omaha policy issued to the Association.